```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
     IN RE:  UNITED STATES SUGAR )
 3   CORPORATION LITIGATION       )    Case No.
                                  )    08-80101-CIV-MIDDLEBROOKS
 4                                )
                                  )    Miami, Florida
 5                                )    March 16, 2009
     _____)    1:46 p.m.
 6

 7                         PAGES 1 - 121

 8               TRANSCRIPT OF MOTION HEARING

 9          BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS

10                     U.S. DISTRICT JUDGE

11   Appearances:

12

13   For the Plaintiffs:         COLSON, HICKS, EIDSON
                                  BY:  CURTIS MINER, ESQ.
14                                BY:  MIKE EIDSON, ESQ.
                                  255 Aragon Avenue, 2nd Floor
15                                Coral Gables, Florida  33134

16                                SQUITIERI & FEARON
                                  BY:  LEE SQUITIERI, ESQ.
17                                32 East 57th Street, 12th Floor
                                  New York, New York  10022

18   For the Defendants:         GUNSTER, YOAKLEY & STEWART
                                  BY:  CURTIS ALVA, ESQ.
19                                BY:  FABIENNE FAHNESTOCK, ESQ.
                                  450 East Los Olas Boulevard
20                                Fort Lauderdale, Florida  33301

21

22

23
     Reporter:                   Karl Shires, RPR
24   (561) 514-3728              Official Court Reporter
                                 701 Clematis Street, Suite 258
25                               West Palm Beach, Florida  33401
```

```
 1   APPEARANCES:  (Continued)

 2

 3   For the Defendants:        KING & SPAULDING
                                BY:  RICHARD SCHNEIDER, ESQ.
                                1180 Peachtree Street NE
 4                              Atlanta, Georgia  30309

 5                              GREENBERG TRAURIG
                                BY:  DAVID A. COULSON, ESQ.
 6                              1221 Brickell Avenue
                                Miami, Florida  33131
 7
                                ALSTON & BIRD
 8                              BY:  H. DOUGLAS HINSON, ESQ.
                                1201 West Peachtree Street
 9                              1 Atlantic Center
                                Atlanta, Georgia  30309
10
                                WHITE & CASE
11                              BY:  RUDOLPH ARAGON, ESQ.
                                200 South Biscayne Boulevard
12                              Suite 4900
                                Miami, Florida  33131
13

14

15

16

17

18

19

20

21

22

23

24

25
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

| 1 | THE COURT:  Okay.  This is a hearing in the case of |

1      THE COURT:  Okay.  This is a hearing in the case of

2      In Re United States Sugar Corporation Litigation, Case No.

3      08-80101.

4              Could we please have appearances.

5              MR. MINER:  Good afternoon, your Honor.  Curtis

6      Miner and Mike Eidson from Colson, Hicks, Eidson for the

7      plaintiffs.

8              THE COURT:  Good afternoon.

9              MR. SQUITIERI:  Good afternoon, your Honor.  Lee

10     Squitieri, Squitieri & Fearon, for the plaintiffs.

11             MR. ALVA:  Your Honor, Curtis Alva and Fabienne

12     Fahnestock of Gunster, Yoakley & Stewart for United States

13     Sugar Company.

14             THE COURT:  Good afternoon.

15             MR. SCHNEIDER:  Richard Schneider, King & Spalding,

16     for defendant named as US Trust Company NA.

17             THE COURT:  Good afternoon.

18             MR. COULSON:  Good afternoon, your Honor.  David

19     Coulson here on behalf of Robert Buker, John Butler,

20     Frederick Kirkpatrick, Roy Peterson, W. Archibald Piper,

21     William H. Piper, Lloyd Reuss, Horace Wilkins, and Gerard

22     Bernard.

23             THE COURT:  Good afternoon.

24             MR. HINSON:  Your Honor, excuse me.  Doug Hinson of

25     Alston & Bird Byrd here representing William S. White and

1    Ridgway White.

2              THE COURT:  Good afternoon.

3              MR. ARAGON:  Good afternoon, your Honor.  Rudolph

4    Aragon from White & Case representing defendant Charles

5    Stewart Mott Foundation.

6              THE COURT:  Good afternoon.

7              Is that it?  Okay.  Let's figure out how we're

8    going to proceed.  There have been a number of motions to

9    dismiss filed.  I've reviewed them.  I've also tried to read

10   the operative documents.  I did read the complaint and then

11   the trust agreement, the plan, and then there's some

12   procedures; the SPD or something I think you call them.

13   Let's try to figure out how much time you need and how you

14   want to proceed.

15             MR. ALVA:  Curtis Alva for United States Sugar.

16   The defendants have divided the preparation.  We're prepared

17   to either answer questions or make argument, your Honor,

18   whichever would be most useful to the Court.

19             THE COURT:  When you say you've divided it, how

20   have you done that?

21             MR. ALVA:  The different defendants -- we would

22   propose, your Honor, to first start with an exhaustion

23   argument, and Mr. Schneider would make that argument.  There

24   are other arguments then to be made by the various

25   defendants.  Typically, your Honor, the defendant that did

```
 1   the briefing on the issue is the one that would present the

 2   argument --

 3              THE COURT:  Okay.

 4              MR. ALVA:  -- in case you memorized how we briefed

 5   it.

 6              THE COURT:  What do you have in mind?

 7              MR. MINER:  So long as I get equal time to respond

 8   to whatever arguments they have, I don't care how it's

 9   divided up, your Honor.

10              THE COURT:  Okay.  We'll try to give everybody

11   equal time.  I do have some questions, and we're also going

12   to probably get interrupted from time to time.  We've had a

13   lot of questions this morning from the jury.

14              Okay.  Let's start with exhaustion.

15              MR. SCHNEIDER:  Your Honor, would you like me at

16   the podium or up here is fine?

17              THE COURT:  Wherever we can hear you is fine.  The

18   podium gives Karl a bit of an advantage.  So if you don't

19   mind, that might be easier.

20              MR. SCHNEIDER:  Okay.

21              THE COURT:  I guess I'm curious what exhaustion

22   accomplishes.  It looks like the -- under the trust agreement

23   that the trustee is responsible for valuing assets, although

24   I note there's some language in the plan which seems to

25   suggest the committee would have a role.  But I don't see
```

1 how -- how does that work?  Doesn't the trust agreement say

2 the trustee has the exclusive right to determine the value of

3 the stock?

4          MR. SCHNEIDER:  Yes, your Honor.  Let me answer

5 both parts of your question.  I'll start with the second part

6 first.  The trust agreement says in Section 5.3 that the

7 trust determines valuation in a case like this where the

8 stock is not sold on a public market in conjunction with and

9 based upon an appraisal done by an independent appraiser.

10 The plan says in Section 5.3 that the committee determines

11 valuation.  Again, also based on input from an independent

12 appraiser.  The link between the two is that the trust is

13 required to report that value to the plan and both in effect

14 have input into that proposition.  The independent appraiser

15 in this case, Houlihan Lokey, makes its assessment of value

16 based upon the standards that govern it.  It reports that to

17 the trust.  The trust evaluates that, analyzes that, reports

18 it to the committee, and the committee then has the

19 opportunity to ask questions, provide additional information,

20 or do whatever else is necessary in the circumstances.

21          If, for example, this case had proceeded with the

22 plaintiffs in this case making a claim to the committee about

23 its views on what the proper interpretation of fair market

24 value was, what that term meant in the plan and how it should

25 be interpreted, the committee has the power under the plan

```
 1    agreements -- under the terms of the plan itself to interpret

 2    the plan, to make a decision on that, to get expert

 3    assistance, to get independent counsel, and to go through

 4    that process.

 5         Now, your Honor began with the question of what

 6    purpose would be served by this.  Well, there are several

 7    levels of answers to that.

 8         First, the Statute 29 USC 1133 provides that every

 9    plan is supposed to make available a review procedure.  It's

10    a statutory requirement.  And infused in that statutory

11    requirement is the thought that the parties should go through

12    it, that there's value to that, that it reduces the number of

13    lawsuits, it reduces costs, it allows for uniformity in the

14    fiduciary decisions.

15         THE COURT:  Well, I understand how it can have a

16    lot of value.  But is there any indication that it would be

17    anything other than just an answer, well, we don't set the

18    price, the appraisers set the price, and this is what it was?

19    And has there ever been an issue which arose about stock

20    price as opposed to what benefits some individual was

21    supposed to get?

22         MR. SCHNEIDER:  In terms of what has happened at US

23    Sugar, the facts with respect to that are not part of this

24    record.  We're here on a motion to dismiss.  But I'm not

25    aware of any prior instance where the valuation has been
```

```
1    challenged in a claims made procedure to the committee.  But,

2    however, the plan agreement, the plan document squarely says

3    that the committee has the power to interpret all aspects of

4    the plan, and its decision is final and binding.

5         And for your Honor -- the benefit for the parties

6    and for the Court is that a claim is made to the committee,

7    they make a decision based upon whatever record is before

8    them, they exercise their fiduciary discretion, and then,

9    your Honor, if they are dissatisfied with that resolution,

10   they can come back to this Court at that point and ask your

11   Honor to review that fiduciary decision on that

12   administrative record on a standard of arbitrary and

13   capricious abuse of discretion review.  It would change the

14   nature of the claim being put before the Court.

15        Now, this case has been pending since January 2008.

16   There was time before that and there has been time since for

17   these plaintiffs to pursue the administrative remedy made

18   available to them, and they have not done that.

19        The exhaustion remedy is one that honors the plan,

20   it honors the fiduciary, it honors the statute, and it

21   provides the Court with the opportunity to rule not on a case

22   out of whole cloth with discovery on a different record but

23   instead an administrative record decided before the

24   fiduciary.

25             THE COURT:  But I guess the question is whether
```

```
 1    the -- it's simply futile if the stock price is set.  They

 2    reference a provision of the Internal Revenue Code in terms

 3    of how the appraiser goes about setting value.

 4              MR. SCHNEIDER:  Yes.

 5              THE COURT:  470 or 170.

 6              MR. SCHNEIDER:  Yes.

 7              THE COURT:  How does that work?

 8              MR. SCHNEIDER:  That IRS Code Section 170 is a code

 9    section that refers to the qualifications that an independent

10    appraiser has to meet.  And it goes into basically that they

11    have to be an appraiser, they've got to be -- someone's got

12    experience in the area.  It really doesn't -- that

13    Section 170 doesn't spell out how fair market value is

14    supposed to be assessed.  That is an issue for experts like

15    Houlihan Lokey to decide as an independent appraiser.

16              And if the plaintiffs contend that the fair market

17    value term in the plan or in the trust agreement means

18    something other than the standard approach that apply to

19    valuing companies, they can make that contention, allow the

20    committee to make its decision based on that contention, and

21    then this Court can review that on an administrative record.

22              Your Honor, I think I heard you say you wondered

23    whether it was futile because the stock price has been set.

24    Well, there is nothing in the plan document that precludes

25    the committee from taking up the claim of a participant or
```

```
1    group of participants that suggests that the valuation should
2    have been set in a different way and assessing whether or not
3    that, in fact, is correct.  There's nothing that prevents the
4    committee from undertaking that review, from having that
5    discussion with the trustee, and from having independent
6    advisers advise the committee as to what it should do.  But
7    that claim was not presented to the committee, and it should
8    have been.
9               THE COURT:  What role does an offer play in
10   arriving at the value of the stock?
11              MR. SCHNEIDER:  Well, your Honor, that's again a
12   question that relates ultimately to the merits, the
13   underlying merits of this claim.  That claim would be decided
14   by the committee.  And I'll hold up.
15              THE COURT:  Give me just a second if you would.
16      (Pause in Proceedings.)
17              THE COURT:  Go ahead.
18              MR. SCHNEIDER:  All right.  I believe your Honor
19   was asking what role does the -- would the Lawrence Group
20   offer play on a valuation.  I think you were asking that
21   question.  And my first line of response to you is to say the
22   merits of that issue ultimately should be decided in the
23   first instance by the committee.  That's what exhaustion is
24   all about.
25              Now, there are cases out there that comment on this
```

```
 1    issue.  There is the case of Foltz versus US News out of the
 2    DC Circuit, a landmark case, that discusses the very issue of
 3    what you are supposed to do in terms of valuing the stock of
 4    a closely held company that produces goods and services.  It
 5    says that that's to be evaluated as a going concern based on
 6    its income stream and not on the basis of assets as to which
 7    the company in control has not made any imminent decision to
 8    dispose of or liquidate.
 9         Now, whether or not the committee would ultimately
10    adhere to that view and not want to depart from the way in
11    which Houlihan -- in wanting to depart from the way Houlihan
12    Lokey has done it is a decision for the committee to make in
13    the first instance.  And to allow the plaintiffs to not make
14    any effort to exhaust, to come directly to Court, to spend
15    whatever it's been, a year, in litigation and discovery
16    bypassing an available procedure is simply to defy the
17    exhaustion requirement, defy the statute, and defy the fact
18    that the committee has the power to decide this issue.
19    Whether they would decide it differently than it's been
20    decided so far is not the determining issue.
21         There have been a number of cases that have focused
22    on the fact that the mere fact that the committee has already
23    made a decision in this area doesn't foreclose exhaustion in
24    seeking an appeal and making a claim.  You have the right to
25    do that under these exhaustion procedures.  And the
```

1    fiduciaries, the committee has the right to expect that

2    process to be completed.

3            THE COURT:  Now, these three committee members are

4    members of the board of directors?

5            MR. SCHNEIDER:  Well, as of June 2006, I believe,

6    one of the committee -- one of the current committee members,

7    Mr. Bernard, is a -- both a -- he sits as a director but is

8    also a person who sits on the committee.

9            MR. COULSON:  I hate to interrupt my co-counsel,

10   but Mr. Bernard is my client.  He is the chief financial

11   officer of US Sugar, but he is not a director and has never

12   been a director.

13           MR. SCHNEIDER:  All right.  Thank you.  Stand

14   corrected.

15           The other two members of the committee currently,

16   my understanding, are not on the board of directors as well.

17           In any event, the three people that are appointed

18   as the committee have the power under the plan.  And we've

19   cited the specific provisions of the plan that recite that in

20   our argument.

21           The exhaustion requirement in the Eleventh Circuit

22   is strictly interpreted.  And the exceptions are narrow, so

23   says the Perrino case, for exceptional circumstances.

24   Exhaustion applies not only to a routine claim by one

25   individual for benefits but also to claims by classes making

```
 1   fiduciary claims, as is the case here.  The Perrino case, the

 2   Bickley case, and the recent Lanfear case all stand for that.

 3        THE COURT:  Well, the CFO apparently knew then that

 4   these offers had come into the board, didn't he, or at least

 5   he knew something about them.  Wouldn't it be incumbent on at

 6   least him to raise the issue of whether the value was correct

 7   given the -- it seems like the discrepancies in value were of

 8   a significant magnitude between I think the valuation and

 9   then they have some IRS valuation.  I don't know who would

10   have seen that one.  Plus then the offer.  What was it;

11   151 percent?  Some differential like that?

12        MR. SCHNEIDER:  Well, the values in the range of

13   2005 were in the range of about $200 and the Lawrence

14   interest was $293.  The value of $200 set for the ESOP was

15   for the minority interest owned by the ESOP.  The value

16   offered by the or expressed by the Lawrence Group was 293 for

17   100 percent control.  They were not making that offer for the

18   minority share.

19        But in any event, those facts, the merits of all of

20   that, what took place, what the CFO did, what discussion

21   there was between Houlihan and the trust and the officers of

22   the company concerning this expression of interest are facts

23   that go to the merits of this issue that should be hashed out

24   in the exhaustion proceeding, not here.  Those facts are not

25   on the face of this complaint.
```

```
 1              The complaint alleges that, yes, the company was

 2    aware of the Lawrence Group expression of interest.  The

 3    complaint alleges that.  What happened to all of that -- we

 4    happened to know some more of the information about that by

 5    virtue of discovery that's been done in this case.  But in

 6    terms of the record before this Court on the motions to

 7    dismiss, the question is did the committee have the power to

 8    decide this issue and have the plaintiffs articulated any

 9    legal excuse for not pursuing that exhaustion remedy.  And

10    they have not.

11              They predict that it would be futile.  They make

12    two arguments really in Paragraph 130 of their complaint.

13    They argue first that there is no procedure available for the

14    review of this claim.  But that overlooks the broad grant of

15    power given to the committee in the plan document.  It

16    overlooks the Lanfear decision, just in July of 2008, that

17    says a broad grant of power to interpret all things related

18    to the plan effectively indicates the availability of a

19    remedy for administrative review.  They also argue that

20    there's nothing in the plan which would allow a determination

21    of a systemic claim like this as opposed to a claim for

22    benefits.

23              There are a couple things wrong with that.  First,

24    in addition to whatever else it may be characterized as, the

25    plaintiffs claim that the valuation should have been higher
```

```
1    is nothing more or less than a benefits claim.  In earlier

2    iterations of their complaint they assert a claim under

3    502(a)(1)(B), a claim for benefits, indicating what it is.

4    But in addition to that, there's nothing in the plan that

5    limits this committee from determining what they call a

6    systemic issue.  A systemic undervaluation issue is what they

7    call it.  They claim that fair market value should have been

8    assessed on an asset basis as opposed to a going concern

9    basis.  Ultimately, the merits of the case, if it came back

10   before this Court, depending on the decision by the

11   committee, would require expert testimony on those issues.

12   And what we would expect is that the Court would hear

13   testimony from renowned experts saying that in a circumstance

14   like this with an ESOP of a closely held company that

15   produces goods and services, the well established way to

16   value that is through a going concern methodology; looking at

17   the value of the company tied to its income stream and not

18   based upon what its liquidation of its assets may be sometime

19   ten years in the future when there's no imminent decision

20   made to liquidate those assets.  But all of that should in

21   the first instance be hashed out before the committee.  And

22   the plaintiffs simply have not given that opportunity --

23   given that claim an opportunity to be heard in the

24   exhaustion, in the administrative remedy procedure.

25             Now, the plaintiffs allege, and your Honor was
```

1    alluding to this, that in effect the same decider will be

2    deciding their claims and, therefore, it's futile because

3    they're bound to decide against us.  That very argument has

4    been rejected in the Lanfear case and in the Springer case

5    very expressly, very clearly.

6         The plaintiffs sent in yesterday -- I believe

7    they've had the decision for some period of time.  But they

8    sent in yesterday a decision called Almonor versus Bank

9    Atlantic.  It's a supplemental authority.  And in that case

10   Judge Ungaro-Benages says that because in that case the

11   defendants were the same decider but they'd also announced

12   how they're going to come out on the claim, she ruled in that

13   case that that was futile to order exhaustion.

14        With all due respect, that's contrary to the

15   Lanfear decision which states the mere fact that the

16   committee members have an interest or have -- or employees

17   doesn't mean that they can't get to decide and doesn't mean

18   that exhaustion is excused.  You've got to go through that

19   process.  And one of the steps in the process for review:

20   The claim is made, it is decided, and then it comes before

21   this Court if the plaintiffs challenge it, and you'll have to

22   determine whether or not what standard of review will apply,

23   whether it's an arbitrary and capricious abuse of discretion

24   standard or a heightened arbitrary and capricious standard or

25   a de novo standard if you determine that there was no power

1    in the fist place.  But that's the way in which an

2    administrative claim, an administrative review claim would be

3    processed.  That has all been bypassed here or they have

4    attempted to bypass it by bringing this claim directly to

5    this Court, engaging in discovery, and not going through the

6    administrative record procedure.

7              THE COURT:  Which claims does exhaustion apply to?

8    Just the ERISA claims?

9              MR. SCHNEIDER:  Yes.  The exhaustion argument

10   applies to the ERISA claims, and I make these arguments today

11   on behalf of defendant US Trust named as US Trust Company but

12   also on behalf of all of the defendants affected by ERISA

13   claims.

14             THE COURT:  But you argue that the state law claims

15   are preempted.  I guess someone else has that argument.

16             MR. SCHNEIDER:  Yes, someone else will have that

17   argument.

18             THE COURT:  That everything else is preempted?

19             MR. SCHNEIDER:  That the state law claims are

20   covered by ERISA -- barred by ERISA preemption is an argument

21   that co-counsel will make here today.  But the ERISA claims,

22   the claims that are made in this case currently under

23   502(a)(2) and 502(a)(3) and 510 are all subject to ERISA.

24   And there have been cases decided by the Eleventh Circuit

25   that say that exhaustion in this circuit is well established,

 1    it's strict, and it applies to all forms of ERISA claims.

 2    There are no outs.  And the exceptions, as I said a moment

 3    ago, are for narrow and exceptional circumstances not made

 4    out here.  Certainly not on the basis of the two arguments

 5    they set forth in their complaint.  Although, alleged in the

 6    complaint in Paragraph 130 is there's no procedure available.

 7    That's wrong on the face of the document.  It's also wrong as

 8    a matter of law because of Lanfear.  And they argue somehow

 9    the committee can't decide issues of valuation when they've

10    been given a broad grant of power both in Section 11 of the

11    plan and in Section 5.3 on valuation issues.

12            THE COURT:  Okay.  Why don't we hear from Mr. Miner

13    on exhaustion then.

14            MR. SCHNEIDER:  All right.

15            MR. MINER:  Good afternoon, your Honor.  Curtis

16    Miner for the plaintiffs.

17            Your Honor, you began by asking what exhaustion

18    would accomplish in this case.  As a practical matter what it

19    will accomplish is delay.  If we have to go through the

20    exhaustion requirement, this is -- we will do it, and this is

21    what will happen.  We'll first bring our claim, the very same

22    claim that's brought here and the defendants are well aware

23    of, to the ESOP committee that we've sued here that was

24    appointed by the board of directors that we've sued here.

25    They get 60 days to decide our claim.  And when they reject

 1    it, we get to appeal to the very same committee.  And they

 2    get 90 days to then decide our appeal.  So five months from

 3    now or thereabouts we'll be right back where we started, here

 4    in court with the very same claims.

 5             None of the defendants has ever suggested that they

 6    have any intention of recognizing the plaintiffs' claims.

 7    What they've suggested is they want the plaintiffs to

 8    essentially jump through these hoops before the claims are

 9    brought back here.  In fact, the key defendants have

10    recognized the exact opposite.  They've stated right in their

11    papers their position is that there is nothing wrong with the

12    valuation.

13             THE COURT:  Excuse me a second.

14       (Pause in Proceedings.)

15             THE COURT:  Go ahead.  I'm sorry.

16             MR. MINER:  Your Honor, we know what the

17    defendants' position is, we know what the ESOP committee's

18    position is.  They say it right in their paper.  US Trust

19    believes its valuation is entirely correct and proper,

20    period.

21             THE COURT:  Well, valuation, it doesn't seem like,

22    would -- especially if you're going to value a company

23    quarterly, there needs to be a methodology as opposed to

24    whatever, you know, expression of interest comes in at the

25    moment.  I mean, valuation shouldn't jump around quite that

1    much, should it?

2            MR. MINER:  Well --

3            THE COURT:  I mean, either you've -- it seems like

4    the going concern would be one way to value it.  I don't know

5    what happens in a going concern valuation if there are offers

6    and counteroffers flying around, whether that's recognized by

7    valuation or not.  But wouldn't -- I would think that there

8    would be -- you would want to be -- use consistent

9    methodology, otherwise you would have different winners and

10   losers in between the course of a year.

11           You've had at least a couple of Lawrence Group

12   offers, it looks like, or discussions of offers.  You've got

13   the State of Florida in there.  And presumably they make a

14   certain amount of income and have -- their assets are valued

15   at a certain amount, and I guess they have a book value.  So

16   it would seem like a uniformed methodology would be

17   desirable.  And either you change it or you don't.  Either

18   you're doing it wrong and you get a second opinion from some

19   investment banker that the way we're doing it is wrong or you

20   stand on what you've done.  And shouldn't they have a chance

21   to make that decision?

22           MR. MINER:  Your Honor, there is a definition --

23   the ESOP participants were supposed to be paid the, quote,

24   fair market value for their shares.  It's a term of art.  It

25   appears in the IRS code.  It also appeared in a proposed

1    regulation by the Department of Labor to cover ERISA plans.

2    And the definition of "fair market value" under this

3    definition is the one that we're all sort of familiar with.

4    It's what a willing buyer would pay a willing seller if

5    neither one is under compulsion to buy or sell and both are

6    well-informed about what they're buying and selling.  Under

7    that definition, your Honor, we believe that when an offer is

8    made for the company, it's something that has to be factored

9    into the fair market value.  It doesn't mean it necessarily

10   jumps around.

11        You know, when the State of Florida made its offer

12   to purchase all of the land of US Sugar, I don't think that

13   necessarily means under fair market value it automatically

14   jumped that moment to that exact price.

15        THE COURT:  It would be jumping back down today.

16   Isn't that the problem?  When you start predicting what's

17   going to happen at some future date, you come up with all

18   kinds of numbers?

19        MR. MINER:  Not when you take into the second part

20   of it, which is the asset value.  What the board of directors

21   did back in 2005 and 2006 to justify their decision to turn

22   away the Lawrence Group offer is they commissioned a land

23   valuation of their land.  And they got a land valuation that

24   gave it a very, very high asset value.  This is in our

25   complaint as well.  This is what they used sort of as their

```
 1    cover or justification to turn away the offer.  That we say,

 2    that asset valuation, also has to be taken into account into

 3    the fair market value of the shares.  That asset valuation is

 4    going to fluctuate over time.  As well as we've seen, land

 5    prices do fluctuate in the State of Florida.  But it's going

 6    to remain more constant.

 7              In any event, sort of taking a step back from this

 8    whole issue, this is really an area for dueling expert,

 9    dueling witnesses.  It doesn't necessarily impact the -- I

10    don't think it impacts the exhaustion requirement at all.

11    It's an issue that's very relevant to the case.  But I think

12    it's a fact issue for dueling experts to fight over.

13              THE COURT:  Yes, but who decides first whether

14    we're dealing with a -- more or less almost an appellate

15    record or whether we're striking out on our own from scratch?

16    Isn't that basically what the exhaustion requirement deals

17    with?

18              MR. MINER:  We already know US Sugar and US Trust's

19    position on the valuation.  They said it right in their

20    papers.

21              THE COURT:  How did they have the different one for

22    the IRS?  Your complaint has an IRS number, a committee -- or

23    an ESOP number, and then you've got this 293 or whatever it

24    is.

25              MR. MINER:  Certain of the shareholders in the
```

 1    company are charitable entities.  They have to file a form

 2    with the IRS called an IRS Form 990.  On that they have to

 3    disclose their assets and disclose the valuations for their

 4    assets.  That's where that figure comes.  It shows that

 5    certain of the charitable shareholders were valuing their

 6    shares as low as $150 or so per share, which is about half of

 7    what the Lawrence Group was offering.  It's just a marker

 8    that we used in our complaint to show how significant, how

 9    valuable the Lawrence Group's offer was when you compare it

10    to what the shareholders were saying their shares were worth

11    to the IRS.

12              THE COURT:  So basically your argument is it's

13    futile and it's the same decision makers.  Is

14    there anything -- is that basically it?

15              MR. MINER:  No.  That's my practical argument.  Let

16    me take a step back to my legal argument.

17              Your Honor, you said you took a look at the SPD,

18    the summary plan description.  When you read this, this is a

19    claims process that's designed for people who come in,

20    individual employees, and make a claim for their benefits,

21    for example, a claim that they're entitled to receive their

22    shares now or entitled to have early retirement now, and they

23    get denied.  This is not a claims process that at all fits

24    what the claims are here for two reasons.

25              First, let me bring up Judge Ungaro's recent

1    decision.  This is in the Almonor case.  Under similar

2    circumstances, an ERISA class action.  Judge Ungaro held that

3    she would not impose an exhaustion requirement.  This is what

4    she said.  First, the Court notes that a plain reading of the

5    plan's claims procedure indicates that it is intended to

6    serve as an administrative procedure for persons whose claims

7    have been denied under the plan, not where a participant

8    brings suit on behalf of the plan for breaches of fiduciary

9    duty.  Plaintiff is not seeking a determination of her rights

10   under the plan but rather plaintiff is seeking redress for

11   defendant's breaches of fiduciary duty on behalf of the plan

12   itself.  Thus, the Court fails to see how the plan's claims

13   procedure would remedy plaintiff's claim.

14          We have the exact same situation here, your Honor.

15   The plaintiffs in this case --

16          THE COURT:  I don't understand, though.  Because

17   every ERISA case they argue basically a breach of fiduciary

18   duty and then the question is what standard you use; don't

19   they?  Anytime somebody doesn't get paid they basically argue

20   breach of fiduciary duty.

21          MR. MINER:  Sure, you may have a claim where

22   someone brings a claim for denial of benefits.  You know, I

23   didn't get my healthcare.  I didn't get my disability.  And

24   they say you've breached my fiduciary duty when you denied my

25   healthcare and my disability.  But the breach of fiduciary is

```
 1          to them.  It's not on behalf of the plan itself.

 2                  We've brought what's been called by the defendants

 3          a systemic argument that all of these shareholders, the

 4          entire plans had its shares undervalued by the company.  So

 5          that's why the claim is on behalf of the plan itself.  And

 6          when you look at the claims procedure in the --

 7                  THE COURT:  What does that mean?  Because the

 8          ones -- you're talking about past people or people today?

 9                  MR. MINER:  This would apply to the people who have

10          sold their shares.  So they sold their shares at a price that

11          was, we argue, too low from what the fair market value was

12          and thereby have been damaged.

13                  THE COURT:  So anybody that sold, what, before the

14          Lawrence Group made that first offer?  Is that the -- what

15          you say?

16                  MR. MINER:  Our class definition is anyone who sold

17          after -- from August 2005 to the present.  After the Lawrence

18          Group offer, after this high land valuation was received by

19          the board of directors.  So 2005 to the present.

20                  THE COURT:  What about the state?  Wouldn't those

21          people then be trumped by the state offer?

22                  MR. MINER:  These are people who are already gone.

23          They have sold their shares.  They're out.  They've incurred

24          their damages, whatever it is.

25                  The people who still have their shares, I think
```

1    that's what your Honor might have in mind, they stand

2    potentially, if this state deal goes through, to benefit from

3    that.   That's a different issue.   Those -- we do not have in

4    our complaint as pled ERISA claims on behalf of the existing

5    shareholders.   It's for the existing shareholders that we

6    brought the common law claims which are the subject of

7    different arguments by the defendants.

8              THE COURT:   How does this work?   I've tried to read

9    the plan to figure out how you -- you can sell your shares

10   back to -- well, first, you don't get any shares, I guess,

11   until you retire; is that it?

12             MR. MINER:   There's different things that trigger

13   it.   Early retirement, retirement.   If you get fired, you get

14   something called five-year break shares.   After five years

15   you're allowed to get your shares and put them back to the

16   company.   There's different triggering events.

17             THE COURT:   Okay.   And then once you have shares,

18   you can sell them back to the company -- or make either the

19   plan or the company buy your shares back at the plan rate.

20   It looks like you could also sell them to a third party.   But

21   you have to give, what, right of first refusal?

22             MR. MINER:   You have to give right of first

23   refusal.

24             THE COURT:   And they can match that offer?

25             MR. MINER:   Right.   In reality there is no third

 1    parties since it's a privately held company.  There's no

 2    market.

 3              THE COURT:  Wouldn't the Lawrence Group be

 4    interested or couldn't you sell to somebody like that,

 5    somebody that thinks that this is really undervalued and,

 6    therefore, we're going to start gathering up some shares?

 7              MR. MINER:  Yes, but because of the nature of

 8    the -- the ESOP owns less than a majority of the shares.  And

 9    in order even to get to all of the ESOP participants, you

10    would have to wait until they all retire which could be

11    decades.

12              THE COURT:  Well, isn't that partly their argument;

13    that the ESOP, if it only has a minority, that these prices

14    that people were offering for control of the company or

15    51 percent don't really even come into play.

16              MR. MINER:  Sure.  There's a minority discount that

17    applies, but the minority discount doesn't account for taking

18    it all the way from the valuations that we believe would be

19    proper at the fair market value to the valuations of $194 per

20    share or less that the company was paying to its employee

21    shareholders.

22              THE COURT:  All right.  Anything else on this

23    exhaustion point?

24              MR. MINER:  Just the other note on the exhaustion

25    point.  There are two reasons that this is really just a --

```
 1   these are claims that are a square peg and trying to stuff

 2   them into a round hole of the claims procedure that just

 3   doesn't fit.  And the other one is that if you look under the

 4   trust agreement, it quite clearly says in furtherance of the

 5   purposes of the plan -- this is the trust agreement that

 6   describes the powers exercised by the trustee, US Trust.  In

 7   furtherance of the purposes of the plan and the trust, the

 8   trustee is authorized and empowered to --

 9             THE COURT:  Tell me where you are.

10             MR. MINER:  I'm sorry.  It's Page 11, Section 4.2.

11   And 4.2D in particular.

12             THE COURT:  All right.  Go ahead.

13             MR. MINER:  In furtherance of the purposes of the

14   plan and the trust, the trustee is authorized and empowered

15   to exercise the following powers in its sole discretion.  "D"

16   is to determine for all purposes of the plan the market value

17   of any securities or property held by the trustee.

18             The way I read the trust agreement is that's the

19   sole power of US Trust to do.  And I think you have to go

20   through sort of a convoluted reason of the ESOP plan to

21   suggest that the committee can somehow change what the

22   trustee did or order the trustee to do something different.

23   That's just a second reason, your Honor, that as a legal

24   argument that the claims process provided for in the summary

25   plan description just does not cover the plaintiffs' claims
```

```
 1   here.

 2         THE COURT:  Although -- I agree with you.  That

 3   language seems pretty comprehensive.  But it also on Page 32

 4   of the other plan says for this purpose -- in terms of

 5   valuing participant's accounts, for this purpose the value of

 6   stock held in the trust shall be its fair market value as

 7   determined by the committee based upon the determination of

 8   one or more independent appraisers having expertise in

 9   rendering such evaluations and in accordance with applicable

10   regulations under the code and the act.  So that document

11   seems to put it in the committee, doesn't it?

12         MR. MINER:  At best they contradict each other.  I

13   think the way they're read consistently is that the trustee

14   is responsible for getting the valuation from the appraiser,

15   gives it to the committee, and then the committee is able to

16   rely on what the trustee's done.

17         THE COURT:  What about on Page 22 of the trust

18   agreement they say, again, the fair market value of assets of

19   the trust fund shall be determined by the trustee.  In

20   valuing the assets, the trustee may rely on information from

21   the company, the committee, appraiser or other sources, and

22   will not be libel for an inaccurate valuation based in good

23   faith on such information, which would suggest the committee

24   could play a role in the a valuation, wouldn't it?

25         MR. MINER:  Right.  But no role in telling the
```

```
 1    trustee you've got to redo it or you did it wrong.  It allows

 2    the trustee to obtain information from the committee, the

 3    company, wherever, and synthesize it all into putting

 4    together the valuation that the trustee then provides to the

 5    committee.

 6            THE COURT:  So if the trustee doesn't want to

 7    change its opinion, you think that's it?

 8            MR. MINER:  My reading of it is --

 9            THE COURT:  Could the committee go out and get

10    their own appraisal if they didn't agree with the trustees?

11            MR. MINER:  I think they would have to get a new

12    trustee.

13            THE COURT:  Okay.  So you're argument is while they

14    might be able to communicate some with the trustee, in the

15    final analysis it's the trustee's decision and they can't

16    really impact that decision except perhaps indirectly.  Is

17    that it?

18            MR. MINER:  I think that's right, your Honor.

19            Just as a final note on the exhaustion argument,

20    there are common law claims in this complaint as well.  The

21    exhaustion would apply just to the ERISA claims, which we

22    don't think it does anyway.  But it just sort of points out

23    one of the other inefficiencies that would be involved in

24    ordering exhaustion on some claims when it doesn't apply to

25    others.
```

```
 1              THE COURT:  I guess we'll get to that in a minute.

 2   I suspect they're going to argue that everything is

 3   preempted, aren't they?

 4              MR. MINER:  I suspect they will.

 5              THE COURT:  Okay.

 6              MR. SCHNEIDER:  Just briefly, your Honor.

 7              THE COURT:  Well, what about his last point that

 8   basically the trustee has the sole discretion?  So even if

 9   the committee disagreed, you go back to the committee and

10   they say, gosh, we think you might be right, but under the

11   agreement the trustee has the power.  That's it.  We can't

12   change it.

13              MR. SCHNEIDER:  Well, first, you've read the two

14   provisions in 5.3 of the trust plan and 5.3 of the plan that

15   suggest that both the trust and committee have input, No. 1.

16              No. 2 --

17              THE COURT:  Well, they both have input but one says

18   it has the sole power.

19              MR. SCHNEIDER:  Yes, but 5.3 says that the

20   committee shall set value as well based on input from an

21   independent appraiser and the trustee will communicate to it.

22   But let me go to another point.

23              THE COURT:  How can that work then?  The example I

24   asked him, say, the trustee comes up with its number, they've

25   got their number, the committee says, gosh, they make some
```

```
 1    good points, these offers are coming in really high, we've
 2    hired our independent expert, he thinks the number is too
 3    low, we think the number is too low, can't the trustee just
 4    say, you know, we've got the sole authority, this is the
 5    number?  And then what does the committee do?
 6            MR. SCHNEIDER:  The committee can do a number of
 7    things.  First, it can have that communication with the
 8    trustee as you've described.  That's one thing it can do.  In
 9    addition, ultimately it's within the committee's power as to
10    who is the trustee.  And if it gets to an impasse, it can
11    discharge the trustee.  But more importantly, your Honor, in
12    Article 11.10 of the plan it says --
13            THE COURT:  How do they do that?  If they want to
14    fire the trustee, what's their ability to do that and where
15    is that?
16            MR. SCHNEIDER:  That would be in the trust
17    agreement.  And I've got to go and -- I can find what the
18    termination provisions are.
19            THE COURT:  I guess removal, Page 31.
20            MR. SCHNEIDER:  And the company's board of
21    directors or the committee may remove the trustee at any time
22    by delivering to the trustee not less than 60 days before
23    it's to take effect a written notice of removal.  That's 7.2.
24            But more importantly, your Honor, Article 11.10
25    says the committee shall determine all questions arising in
```

1   the administrative, interpretation, and application of the

2   plan.

3               THE COURT:  Where are you now?

4               MR. SCHNEIDER:  11.10.

5               THE COURT:  Of what?

6               MR. SCHNEIDER:  Of the plan.

7               THE COURT:  All right.

8               MR. SCHNEIDER:  And 11.10 says the committee shall

9   interpret the plan -- excuse me, 11.10 says the committee

10  shall interpret the plan in a nondiscriminatory manner and

11  shall determine all questions arising in the administration,

12  interpretation, and application of the plan.  Any such

13  determination by the committee shall be conclusive and

14  binding on all persons.

15              Now, fundamentally the plaintiffs' claim in this

16  case is that the term "fair market value" in the plan and in

17  the trust agreement should have a certain meaning and it

18  should mean that you should in the circumstances of this case

19  take into account either the Lawrence events or the

20  underlying assets value.  That's a question of interpretation

21  of the plan.  It's a question that the committee can get

22  assistance on.  You heard the plaintiffs say that, well, the

23  fact there might be experts involved means that the

24  committee -- that's not an issue for administrative review.

25  That's not the case at all.  The committee can appoint people

1    to assist it in making this decision to get expert advice, to

2    get outside counsel, independent counsel on this decision.

3    They can do all of that as part of this review process.

4          The plaintiffs began by saying that all that would

5    happen from exhaustion is delay.  But, in fact, if you're

6    supposed to go through an administrative procedure first and

7    present this Court with essentially an appellate record to

8    review, that may take some time.  But they've had plenty of

9    time to do that and have not despite many opportunities.

10          The statute provides for administrative review.

11   You can't argue that that means all that it accounts for is

12   delay.  You heard the plaintiff say that our brief says US

13   Trust thinks its way of doing things was great, period.

14   Well, there wasn't a period.  The actual sentence on Page 9

15   and 10 says, US Trust believes its valuation is entirely

16   correct and proper, but it is for the ESOP committee to

17   evaluate plaintiffs' claims during the administrative process

18   and make that determination in the first instance.

19          Yes, indeed, the trust does believe that the way in

20   which the stock shares have been valued for the ESOP has been

21   proper for the very reason that you are focusing on, minority

22   versus control.  The ESOP owns a minority interest and it was

23   valued as a minority interest.  The Lawrence events involved

24   a controlled price, not the price for a minority interest.

25   That is why ultimately the trust valued the shares as they

1   did and while Houlihan valued the shares as they did.

2          THE COURT:  Let me ask you another question.  This

3   one is a little off the exhaustion issue, but I noted reading

4   it that under certain instances plan participants who have

5   received shares are entitled to direct the trustee as to how

6   to vote the shares.  How does that work?  There's talk of a

7   tender offer.  And I guess that's for all of the shares.

8   There's also a paragraph that talks about if there's an offer

9   to buy a portion of the shares, that the participants can

10  direct the trustee to vote their shares in a certain way.

11  How does that work and in what instances would that be

12  invoked?

13         MR. SCHNEIDER:  Well, there are certain

14  circumstances described in Section 4 of the trust agreement

15  pursuant to which the trust would pass through a decision to

16  the participants.  And if a participant did not vote shares

17  allocated to that participant, the trust would vote those

18  shares.

19         In the case of a tender offer, which there has not

20  been one --

21         THE COURT:  That would be an offer to buy all of

22  the shares of the company.

23         MR. SCHNEIDER:  That would be an -- a tender offer

24  traditionally is an offer directly to the shareholders to

25  purchase their shares.  But let me get to that section in a

 1    moment, your Honor.

 2            THE COURT:  And theoretically Lawrence could do

 3    that, but haven't?

 4            MR. SCHNEIDER:  They have not done so at the

 5    current time with respect to the most recent events, and they

 6    did not do so back in 2005 or 2007.

 7            But whether or not something would be passed

 8    through or not is governed by 4.3.  And I could parse through

 9    those sections for you, but I don't think there's any issue

10    today with respect to exhaustion or even the claims made that

11    turns on that particularly.

12            But in circumstances, for example, board of

13    director elections and other proxy issues, those will be

14    passed through and voted on by participants, and then the

15    trust reports that vote to the plan.

16            A couple of other points by way of response on

17    exhaustion.  The plaintiffs pointed you to the Almonor case,

18    which is the Judge Ungaro decision, and they read a couple of

19    paragraphs from that, one of which was that exhaustion

20    shouldn't apply to a breach of fiduciary duty claim made on

21    behalf of a plan.

22            THE COURT:  Well, let me -- I'm still trying to --

23    I understand that it doesn't have anything to do with

24    exhaustion.

25            MR. SCHNEIDER:  I'm sorry.

```
 1              THE COURT:  I'm trying to understand how this

 2   provision works.

 3              MR. SCHNEIDER:  Are you at 4.3?

 4              THE COURT:  Well, I'm at 4.4 little "i" and four --

 5              MR. SCHNEIDER:  All right.

 6              THE COURT:  -- where somebody makes an offer to buy

 7   shares, when these provisions of the plan come into effect.

 8   Because it looks like there can also be an offer for fewer

 9   than all of the shares of company's stock.

10              MR. SCHNEIDER:  There can be.  4.4A -- you're at

11   4.4 what, your Honor?

12              THE WITNESS:  I'm at 4.4A little "i" and then four.

13              MR. SCHNEIDER:  First of all, that section relates

14   to if the company has registration-type class of securities,

15   that all tender, exchanges or decisions shall be made in

16   accordance with the following paragraph.

17              Well, the shares held by the company -- held by the

18   plan are not registration-type securities.  But in those

19   circumstance if it did have them, they would pass it through

20   in accordance with those provisions.

21              Now, 4.4B says --

22          (Pause in Proceedings.)

23              THE COURT:  Go ahead.

24              MR. SCHNEIDER:  4.4B says if the company does not

25   have registration-type class of securities, then the trustee
```

1    shall tender or exchange or not tender or exchange all

2    allocated or unallocated shares in its own discretion.

3            THE COURT:  So what you say is none of the shares

4    held by the plan are registration-type shares?  And does that

5    also include when they have distributed shares to

6    participants?

7            MR. SCHNEIDER:  That's correct, that the company

8    stock is not a registration-type stock.  But another reason

9    it didn't apply here -- first of all, there was no tender

10   offer made to the trust or to participants or to the company.

11           THE COURT:  I understand that.  I'm trying to

12   figure out whether this -- whether people do have a right to

13   vote their shares at some point under this plan.

14           MR. SCHNEIDER:  Yes.  Well, if you take a look at

15   just Paragraph 4.3, which talks about voting rights on shares

16   of company's stock, it says, in Paragraph A, all stock held

17   in the trust which is not allocated to the stock of the

18   account participants shall be voted by the trust in its sole

19   discretion.  So if a share is not allocated to a particular

20   participant, that's voted by the trust.

21           The next one, 4.4B, says that all stock held by the

22   trust which is allocated to the stock accounts of terminated

23   participants and which terminated participants is not vested,

24   that's going to be voted by the trust.

25           C, all stock held which is allocated to stock

```
 1   accounts or participants which if vested shall be voted by

 2   the trustee in accordance with directions received from each

 3   participant.

 4          So if a matter for a vote, if a matter for a vote

 5   was given to the trust to vote on in that matter under 4.3C,

 6   those participants who have allocated shares would get to

 7   vote and that would be passed through through the trust to

 8   the -- back to the company on a matter in which there is a

 9   vote requested from the trustee.

10          THE COURT:  And what determines whether there is a

11   vote requested?  What type of offer could trigger these

12   provisions?

13          MR. SCHNEIDER:  Well, I may be getting beyond my

14   issues here.  But if the company determined to send out a

15   proxy to its shareholders to get the shareholders to vote on

16   a particular corporate transaction, let's say a sale of

17   assets, in that circumstance -- and the issue is not really

18   ripe before us.  But 4.3C would suggest that if there is a

19   proxy sent out to shareholders to vote on a matter of that

20   kind, it would be passed through pursuant to 4.3C.

21          Now, I was going to just close with just a few

22   points on exhaustion, because I thought it was important.

23   You were read a provision, a couple paragraphs from the

24   Almonor case from Judge Ungaro.

25          THE COURT:  We might need to move onto the next
```

 1   topic.

 2          MR. SCHNEIDER:  I was just going to say the Lanfear

 3   case has quotes that are contrary to that case.  And I just

 4   wanted to point that out, your Honor.

 5          In sum, because exhaustion is favored in this

 6   circuit, it's strictly applied with narrow exceptions that

 7   don't apply here, we would ask that your Honor order that all

 8   ERISA claims be dismissed and so that the plaintiffs can

 9   exhaust their remedies in accordance with the provisions of

10   the plan and the provisions of the law.

11          Thank you for your time.

12          THE COURT:  Thank you.

13          MR. ALVA:  Good afternoon.  May it please the

14   Court.  Curtis Alva on behalf of United States Sugar.

15          Your Honor, there's a preliminary argument that the

16   Court lacks subject matter jurisdiction that I'm assigned to

17   address, but I thought maybe I could give just a little bit

18   of help on the last questions that your Honor was asking

19   about a tender offer.

20          THE COURT:  All right.

21          MR. ALVA:  My understanding of a tender offer --

22   and this is an area where I've practiced since I graduated

23   from law school so I know something about it.  A tender offer

24   is an offer that is made by someone who wants to acquire the

25   stock directly to the stockholders of a company if it's made

```
 1    to more than one stockholder.  So if you approach an

 2    individual stockholder and you want to buy that individual

 3    stock, that doesn't qualify as a tender offer.  But if you

 4    approach more individuals than one, including if you approach

 5    all individuals, that's a tender offer.  You do not have to

 6    approach all individuals in order to have a tender offer.

 7    You can approach just some individuals.  And you do not have

 8    to make an offer to acquire all of the stock.

 9              You can make a tender offer, for example, of

10    51 percent of the stock.  And your Honor might remember that

11    during the 1980s there was a tremendous amount of

12    jurisprudence that was generated by the Courts of Delaware

13    over so-called coercive two-step tender offers where the

14    offerer would come in and say I'll buy 51 percent of the

15    stock for cash at price "X," and then I'll do a merger at the

16    back end for the remaining 49 percent of the stock, and I'll

17    give those people junk bonds that I say are worth as much as

18    the cash I was giving out.  And that had a tendency of

19    stampeding people into the cash part because nobody was sure

20    that in the junk bonds they would actually get the value.

21              So a tender offer does not have to be for

22    100 percent of the stock.  It can be for 20 percent of the

23    stock or 50 percent of the stock or anything, including a

24    hundred percent.

25              THE COURT:  Do these provisions apply to the stock
```

 1   held by the plan?

 2            MR. ALVA:  Yes.  The provisions that you referred

 3   to, your Honor, Section 4.4A of the plan -- what the plan

 4   does is it divides a participant's ability to vote into a

 5   couple of different piles.  There is the sort of general pile

 6   that regulates most decisions that are going to be made by

 7   the person that gets to vote.  But because tender offers are

 8   a source of particular interest, the plan took tender offers

 9   and set them aside and said you have the general pile but we

10   have a specific pile that's going to regulate what happens

11   when you have a tender offer.  If you have a tender offer,

12   then you're regulated by Section 4.4.  And the distinction

13   between the two ways to vote in 4.4 depends on whether or not

14   the stock of the company is a registration-type of

15   securities.

16            Now, generally for a single class of stock, for

17   example, Class A stock of US Sugar, that entire class will

18   either be registration-type or not.  So you won't have some

19   shares of Class A that are registration-type and some shares

20   of Class A that are not.  You could have different classes of

21   stock.

22            THE COURT:  What are these?  Are these registered

23   stock or not?

24            MR. ALVA:  These are not registration-class

25   securities, your Honor, because whether a stock is a

1    resignation-class security is regulated in the first instance

2    by Section 409(e)(4) of the Internal Revenue Code which says

3    that to determine whether you have a registration class of

4    securities you have to turn to Section 12 of the '34 Act.

5    Section 12 of the '34 act tells you that a registration class

6    of securities is one of two things:  Either securities that

7    you want to sell on an exchange, like the New York Stock

8    Exchange, or securities where the assets of the company are

9    greater than 10 million and the company has more than 500

10   record holders.  That's the part that would apply here if it

11   were true about United States Sugar, but it's not.  United

12   States Sugar has never had more than 500 record holders

13   during the relevant time in this case.  And perhaps I don't

14   think it's ever had one.  Well, that may not be true.  But

15   certainly during the relevant time period in this case they

16   have never had more than 500.  So because they have fewer

17   than 500 and at the present time -- I think at the time that

18   the motions to dismiss were filed, your Honor, Gerard

19   Bernard, who's the chief financial officers, signed an

20   affidavit saying at that time there were 68 holders of

21   record.

22            THE COURT:  So this provision related to ability of

23   participants to vote their shares through direction of the

24   trustee would never come into play with US Sugar?

25            MR. ALVA:  Would never come into play as long as US

```
 1   Sugar had fewer than 500 holders of records.

 2            THE COURT:  One reason I got there was your

 3   argument that these offers that Lawrence made to the

 4   president and to the board were not offers because offers to

 5   buy the stock had to be directed to the shareholders as

 6   opposed to the board, and so no weight should be placed on

 7   those.  Those were just preliminary discussions, as I

 8   understood your argument.

 9            MR. ALVA:  That is exactly correct.

10            THE COURT:  So I was curious about whether

11   participants in this plan would ever have any right to vote

12   or to have a say in what was going to happen to their shares.

13            MR. ALVA:  They certainly could, your Honor.  And

14   this is the point that Mr. Schneider was making.  There are

15   two kinds of transactions that you can structure if you want

16   to acquire a company.  One way is that you can buy the stock

17   of the company, and that would be, for example, by a tender

18   offer where you buy the stock from the people that own the

19   stock.  The other way to acquire a company is you don't buy

20   the stock at all but you merge with the company.  So we get

21   together and we have a merger between Company A and Company

22   B.  If you have a merger between Company A and Company B,

23   then, as Mr. Schneider pointed out, you would be under 4.3.

24   And under 4.3 the participants in the plan would get to vote

25   on how they wanted -- whether they wanted to support the
```

1     merger or whether they didn't want to support the merger.

2               THE COURT:  Well, this Lawrence thing then, does

3     that only then go to the majority shareholders -- if the

4     board decided to recommend it, say you decided this $293 a

5     share was just a great deal --

6               MR. ALVA:  Yes, your Honor.

7               THE COURT:  -- what happens next?

8               MR. ALVA:  Then, your Honor, they could still do

9     one of two things.  The board could have either recommended

10    that the shareholders vote and the board could have issued a

11    proxy statement.  And typically in situations like this where

12    the board approves of an offer from an outsider, they issue a

13    joint proxy statement.  So the Lawrence Group and US Sugar

14    would issue a joint proxy statement that said here's the pros

15    and cons of tendering at 293.  Our recommendation is that you

16    tender at 293.  They could do that.

17              Or what commonly happens is if the acquirer comes

18    in and says we want to pay 293 for a stock, you can still

19    flip it into a merger and say, all right, let's turn the

20    thing into a merger and we'll buy some stock and we'll buy

21    some assets or we will form a merger vehicle.  So they can

22    still do it either way.

23              The participants still have opportunities, your

24    Honor, to decide what to do with their stock.  The trustee,

25    if it is a tender offer, will vote their stock for them.  And

```
 1   the trustee, of course, will have the trustee's duties.  And

 2   if there's a merger, there will be pass-through voting.

 3           THE COURT:  I mean, the plaintiffs' argument is

 4   that there's an incentive here by this closely held group of

 5   family members and friends to keep the price in the ESOP low

 6   in order to maintain their control over the company and over

 7   time accumulate the shares from this employee stock ownership

 8   plan --

 9           MR. ALVA:  Yes.  The incentive, your Honor --

10           THE COURT:  -- because they say the company buys

11   back the shares leaving them more of an interest.  Isn't that

12   their argument?  And that you're not sharing the information

13   you have with any of the plan participants.

14           MR. ALVA:  I'm sorry.  Say that one more time.

15           THE COURT:  And that the company is not sharing the

16   information it has with the plan participants.

17           MR. ALVA:  Well, they allege, your Honor, in part

18   that it wasn't shared.  And this is a little out of my tend,

19   by my understanding is that the argument that they make that

20   the Mott White family, for example, and the Charles Stewart

21   Mott Foundation were actually going to increase their

22   percentage ownership, my understanding is, if this were to be

23   decided at trial or summary judgment, is that that cannot

24   occur because of a tax ruling called the Excess Business

25   Holdings Rule which caps the amount of ownership that the
```

1   Mott White family can own and caps the amount that the

2   Charles Stewart Mott Foundation can own so that they can

3   never own more than they owned at the time the cap was

4   established.  So that is just not true.  That could not

5   happen.  So that incentive does not exist.

6           The notion, your Honor, that the -- certain of the

7   defendants have an incentive to buy the stock at a low price

8   and increase their ownership is also -- has also been

9   specifically considered by the Delaware Courts in the

10  Aaronson v Lewis decision where the courts said if it was

11  only the directors that you were making defendants who would

12  get that benefit, then perhaps there's a claim.  But here

13  it's everybody.  All of the rest of the participants in the

14  ESOP also own a little bit more, and all of the rest of the

15  stockholders who are not participants and who are not part of

16  this alleged group with the Mott White family would get more.

17  In fact, the only ones who can't actually benefit from the

18  alleged scheme are the defendants who are named as the ones

19  who had the incentive.  That's my understanding of that, your

20  Honor.  They're capped by the Excess Business Holdings Rule.

21  They couldn't own more if they wanted to.

22          THE COURT:  Go ahead.  You were getting to a topic

23  you were planning to discuss.

24          MR. ALVA:  Thank you, your Honor.  Now I'll get to

25  what I was supposed to talk about.

1           Your Honor, there's an Article III issue here over

2    whether or not the plaintiffs have standing.  And in the

3    Williams case, your Honor, Williams versus the Board of

4    Regents of the University System of Georgia, there's

5    beautiful language that puts it out most poetically.

6           As an irreducible minimum, Article III requires a

7    plaintiff to meet three standing requirements.  First, the

8    plaintiff must show that she has suffered an injury in fact.

9    The plaintiff must show that the alleged injury arises from

10   the invasion of a legally protected interest that is

11   sufficiently concrete and particularized and not abstract or

12   indefinite.

13          Now, the injury that is alleged, your Honor, in

14   this case -- there are 13 of them because there are 13

15   counts.  And every one of the 13 counts, with the exception

16   of Count 4 which is the count that complains about the

17   transaction that's currently considered with the South

18   Florida Water Management District and Count 13 which alleges

19   a sort of separate scheme to take people who are senior and

20   terminate them so as to cut off their benefits, if you set

21   aside Count 4 and Count 13, every other count in this

22   complaint has as its gravamen the allegation that there was

23   an offer made for the stock.

24          Your Honor, Count No. 1 the plaintiffs say that the

25   wrongs that were committed were that the board did not fairly

1    consider the offer.  That's paragraph 90, your Honor, in

2    Count 1.  It also alleges that they did not disclose the

3    offer to the shareholders.  It further alleges that they

4    didn't let the shareholders sell into the offer, that they

5    did not incorporate the offer into the price, and that they

6    rejected the offer because of self-interest.  Clearly Count 1

7    is all about the offer.

8             Count 2 as well, your Honor, in Paragraph 96

9    alleges that the company bought the stock at a price that was

10   below its value, and the reason it was below its value was

11   because the Lawrence Group had allegedly made an offer.

12            Count 3, your Honor, in Paragraph 106 alleges that

13   the participants in the plan were not allowed to sell their

14   shares into the offer, and alleges in Paragraph 105 that the

15   offer wasn't incorporated into the price.

16            Count 4, your Honor, we've already set aside.

17   That's the count that says that there are problems with the

18   potential transaction with the South Florida Water Management

19   District.  So let's go to Count 5.

20            Count 5 also has as its gravamen the offer.

21            THE COURT:  Why isn't there standing?

22            MR. ALVA:  I'm sorry?

23            THE COURT:  Why isn't there standing?  Isn't that

24   what you're getting to?

25            MR. ALVA:  Oh, yes.  Why isn't there standing?

1   Because, your Honor, here whether or not there was an offer

2   is an issue that was regulated by the parties in a contract

3   that they entered among themselves.

4            THE COURT:  But how do we even know any of that

5   now?  Isn't all of the Lawrence Group discussion premature?

6            MR. ALVA:  Well, your Honor, first of all --

7            THE COURT:  The record doesn't really set forth --

8   his argument is that because these things happened, the price

9   was artificially low and that people who I guess cashed out

10  their stock lost.

11           MR. ALVA:  Yes, your Honor.  The reason it's not

12  premature is that, first, on a 12(b)(1) motion the Court can

13  consider matters that are extrinsic to the complaint.  Second

14  of all, the complaint specifically refers to the

15  confidentiality agreement between the parties.  So we can

16  refer to it because the plaintiffs have referred to it in

17  their complaint.

18           THE COURT:  That's like -- it seems like that gets

19  you -- you might as well decide the merits once you've

20  figured out what the offer was or whether it was an offer and

21  what the Lawrence Group did and what you did.

22           MR. ALVA:  Well, no, your Honor.  What this does is

23  it protects the federal courts from spending a lot of time in

24  discovery and in motions dealing with issues where the

25  plaintiff never had an injury in the first place.  So it is a

1    preliminary analysis and it is an obligation of Article III

2    courts to come to a conclusion that the plaintiffs have

3    standing, that they have actually alleged an injury that is

4    sufficient.

5         THE COURT:  Well, if you assume it was an offer,

6    that would be enough, wouldn't?  What you're saying is that

7    it wasn't really an offer.

8         MR. ALVA:  What I'm saying, your Honor, is that if

9    on a 12(b)(1) motion you deny that there was an offer and

10   attack standing, that the plaintiffs then have the obligation

11   to establish that they have a sufficient injury to confer

12   Article III standing.

13        THE COURT:  So I would need to figure out whether

14   this was really an offer or whether this was just preliminary

15   discussions pursuant to the confidentiality agreement and

16   that they had a contractual bar from making a real offer.  Is

17   that basically what you're suggesting I hold?

18        MR. ALVA:  That is correct, your Honor.

19        THE COURT:  And, therefore, there's no standing.

20        MR. ALVA:  That is correct, your Honor.

21        THE COURT:  It sure seems like that's pretty far

22   down the merits path.

23        MR. ALVA:  Your Honor, in a case where the

24   plaintiffs had been able to allege an injury you would be

25   correct.  That is something that would be decided on summary

1   judgment or at trial.  But because the existence of the offer

2   is the gravamen of every count in the complaint, except 4 and

3   13, and because without an offer there is no injury -- your

4   Honor, they have to have -- they have to show that they have

5   a right that has been invaded by the defendants.  Here the

6   right does not occur unless there's been an offer.  That's

7   what they say in every one of their counts of their

8   complaint.  They say there was an offer, so you should have

9   disclosed it.  There was an offer, so you should have fairly

10  asked.  There was an offer, so the board had a conflict of

11  interest.

12          There is no duty owed to these plaintiffs in the

13  allegations set forth in the complaint but for the fact that

14  there is a proper offer.  And that issue, your Honor, can be

15  decided by the Court on a motion for standing because without

16  the existence of an offer there is no right that's been

17  invaded.  The Court has to determine that they have a right.

18  And that right's existence here has been challenged in a way

19  that is sufficient on a motion to dismiss under

20  Rule 12(b)(1).  And the Court is obliged to determine that

21  there is a sufficient injury in fact, that they have a right

22  that we have invaded.  And the right here is conditional.  If

23  there's an offer, they have to disclose it.  If there's an

24  offer, they have to have a proper consideration of it.  If

25  there's an offer, they have a conflict of interest.  If there

 1    is no offer, there is no right that has been invaded.  And if

 2    the Court determines that there's no right that's been

 3    invaded, the Court does not have to do anything else other

 4    than grant the motion to dismiss.

 5         THE COURT:  Is there not the possibility that you

 6    could have something short of what might have the operative

 7    effects of an offer but that could still affect value?

 8         For example, if Lawrence Group says we want this

 9    confidentiality agreement because we're very interested in

10    buying your company, we're -- pending final due diligence

11    we're going to pay you $293 per share.  Assume for minute

12    that that might trigger a duty of disclosure to at least the

13    committee, the CFO who apparently got this, who was involved

14    in these negotiations, might want to say, well, you know,

15    we're buying this stock for $190 a share but they're talking

16    about paying 290.  I wonder if we've been valuing this too

17    low.  Couldn't you possibly have a claim there or at least

18    enough for standing whether or not there was a definitive

19    offer made?

20         MR. ALVA:  Under different circumstances, your

21    Honor, I think that's a possibility.  But under the

22    circumstances alleged in the complaint that is not a

23    possibility and here is the reason why.  The parties that

24    were the parties to the potential transaction, which would be

25    the Lawrence Group, which is not a party to this litigation,

1    has never brought a suit for breach of any contract to sell

2    to them and has never brought any litigation saying that they

3    have made an offer --

4            THE COURT:  Well, how are they running these --

5    aren't they running full page ads now saying they want to buy

6    the shares?

7            MR. ALVA:  Exactly, your Honor.  They are

8    running --

9            THE COURT:  What happened to the confidentiality

10   agreement and the fact that there wasn't an offer?

11           MR. ALVA:  Oh, the confidentiality agreement, your

12   Honor, expired after two years.

13           THE COURT:  So now they're able to do whatever they

14   choose.

15           MR. ALVA:  They can do whatever they want now.  It

16   was signed July 12, 2005.  It expired July 12, 2007.  So the

17   confidentiality agreement would regulate the offer that is

18   alleged at the beginning of the complaint, and then the

19   second offer that was made in January of 2007 would both be

20   governed by the confidentiality.  They could today, your

21   Honor, make a tender offer for the stock.

22           THE COURT:  Okay.  So basically you say I ought to

23   look into it, make a finding this wasn't really an offer and

24   so, therefore, the plaintiffs don't have standing pursuant to

25   the allegations of their own complaint.  That's basically

 1    your argument?

 2            MR. ALVA:  That is, your Honor.  If you would turn

 3    to Paragraph 10, that's the paragraph I would like to refer

 4    to in making that decision.   In Paragraph 10 the Lawrences

 5    and US Sugar decided how they would know whether or not this

 6    partial offer that you're considering that might create some

 7    sort of obligation but perhaps not 100 percent of the

 8    obligations is addressed specifically in Paragraph 10 where

 9    it says, you agree, and "you" is the Lawrences, that unless

10    and until a definitive agreement between the company and you

11    with respect to any transaction has been executed and

12    delivered, so it has to be definitive, executed and

13    delivered, the company will not be under any legal obligation

14    of any kind whatsoever with respect to such a transaction.

15    So here we don't have any gray areas.  The parties decided

16    that -- and, your Honor, it's--

17            THE COURT:  You didn't have an obligation to the

18    Lawrences.  You might have had one to your employees.

19            MR. ALVA:  Your Honor, the obligation to the

20    employees is derivative of some potential obligation to the

21    Lawrences.  It can't exist by itself.  It can't exist outside

22    of --

23            THE COURT:  Why is that?  Why could that be?  If

24    you learned that you had gold under your sugar field, could

25    you just hide that fact and continue to value their shares at

1    $190 a share?

2            MR. ALVA:  No, your Honor, I don't think you could.

3    And I think the difference between that situation and here is

4    that here we've defined what counts as gold.  It's a

5    definitive agreement that's executed and delivered.  If

6    you've got that, you've got gold.  If you don't have that,

7    you don't have gold.  You've got iron pyrite.

8            That's what the parties have agreed.  That's what

9    the expectation of the parties was.  That's what US Sugar

10   understood when it decided to disclose confidential

11   information to the Lawrences, is that they would be under no

12   obligation whatsoever unless there was a definitive, executed

13   delivered agreement.

14           And the standstill agreement that the Lawrences

15   entered into, your Honor, is something that is of great

16   benefit to stockholders and great benefit to people like the

17   Lawrences because it enables them to enter into friendly

18   transactions.  Here we didn't result in a transaction, but

19   it's a very common pattern, your Honor, that you'll have a

20   friendly transaction where a potential buyer will come in and

21   they'll say to the potential target we would like to talk to

22   you, and what we'll do is we'll promise that this will be

23   friendly.  We'll never go hostile to you.  And if on friendly

24   terms we work out a deal, great.  And those are much less

25   risky and much less expensive than a hostile deal.

1          So the shareholders benefit because the company is

2    not involved in costly litigation trying to defend against a

3    hostile offer.  The acquirer saves all of the risk of not

4    being able to succeed and all the expense.  So they're very

5    beneficial, your Honor, to parties and to shareholders.

6          THE COURT:  Okay.  Let's hear from Mr. Miner on

7    standing.

8          MR. MINER:  Thank you, your Honor.

9          THE COURT:  Thank you.

10         MR. MINER:  On standing, your Honor, the defendants

11   are essentially asking you at this hearing on a motion to

12   dismiss to ignore what we've alleged in the complaint and

13   instead to rely on a document they've attached to their

14   motion to dismiss, a confidentiality agreement and an

15   affidavit filed by their CEO and an affidavit filed by their

16   CFO.  It's not only asking you to go part of the way down the

17   road, it's essentially asking you to prejudge issues that are

18   fact issues for trial.  But I want to get past that point and

19   get more into the substance of it.

20         Our argument doesn't matter what you call what the

21   Lawrence Group did; whether you call it an offer, whether you

22   call it an expression of interest, whether you call it a

23   Hallmark card that they sent the board of directors.  Our

24   argument does not turn on how it is characterized.  What our

25   argument is is that when the board of directors got that,

 1    whatever you want to call it, Hallmark card, expression of

 2    interest, offer from the Lawrence Group, that they breached

 3    their fiduciary duty in the way they handled it.

 4            We acknowledge that the board did not allow the

 5    offer to be extended to shareholders, that no tender offer

 6    was made back in 2005, 2006.  That's not the point of our

 7    argument.  Our argument is that when the board had that offer

 8    from the Lawrence Group, they breached their fiduciary duty

 9    in the way they handled it.

10            THE COURT:  Well, what should they do?  What is it

11    you believe should take place?  Basically it would have to

12    somehow find its way into the valuation of the stock.

13            MR. MINER:  Yes.  On the ERISA claims, our

14    valuation claims, it should have found its way into the

15    valuation of the shares for the ESOP participants just as

16    this land valuation that they did to fend off the offer

17    should have found its way into the valuation for the ESOP

18    participants.  But even setting that aside, they also should

19    have -- they should have extended the offer to the existing

20    shareholders at that time for them to decide whether or not

21    to take it.

22            There's a case, a recently decided case that was

23    brought to your attention actually by the defendants in a

24    supplemental authority.  This is Gantler, G-A-N-T-L-E-R.  It

25    came down from the Supreme Court of Delaware.  They actually

```
1    relied heavily on the lower court, the chancery court

2    decision, their motion to dismiss.  In the interim, just a

3    couple months ago, the supreme court reversed that decision.

4           Gantler is very similar to our situation.  In that

5    case shareholders claimed that the board of the company had

6    breached their fiduciary duties by rejecting a valuable

7    opportunity to sell the company.  The Supreme Court of

8    Delaware concluded the plaintiff had pled sufficiently facts

9    to overcome the business judgment rule.

10          There was never any -- in that case there was never

11   any tender offer made to the shareholders.  It's the same

12   thing we have here.  It was a communication with the board,

13   whether you call it an offer, an expression of interest.  And

14   what the Supreme Court of Delaware found is that the

15   plaintiffs had adequately stated the claim, that the board

16   breached its fiduciary duty by not extending that offer to

17   the shareholders.  We have the same thing here.

18          THE COURT:  Well, there there was a -- wouldn't

19   there have to be at least an offer there?  I mean, here --

20   apart from whether you get into the standing issue here,

21   their contention, which seems accurate based on just their

22   filings, I don't know if it's far enough to get to standing,

23   is there was no offer here.

24          MR. MINER:  It depends I guess at which stage

25   you're talking about.  We allege and we believe we will be
```

```
1    able to prove that the Lawrence Group made an offer to the
2    board of directors.  That is clear.  What they challenge and
3    what we actually agree with is that the board did not allow
4    the Lawrence Group to make the offer directly to the
5    shareholders.  So if the issue is whether the Lawrence Group
6    made an offer directly to the shareholders, we agree.  The
7    board prevented them from doing that.  And that's part of the
8    breach of fiduciary duty.
9              THE COURT:  But you think they -- there was a
10   definitive offer made to the company to buy the shares, that
11   the company should have then turned around and presented it
12   to the shareholders?
13             MR. MINER:  That's our allegation, your Honor.
14             THE COURT:  That's your allegation.
15             MR. MINER:  Yes.
16             THE COURT:  And in terms of standing, I guess you
17   would argue it's just premature to try to get to that issue?
18             MR. MINER:  Yes.  And the confidentiality agreement
19   that they -- their standing argument hinges on, the
20   confidentiality agreement regulates the rights between two
21   parties, the company and the Lawrence Group, its contract.
22   It has nothing to do with the company's obligations under
23   Delaware fiduciary duty law or other common law obligations
24   to its shareholders.  That confidentiality agreement can't
25   abrogate or change what the company's obligations to its
```

 1    shareholders are.  We represent shareholders.  Those are the

 2    allegations we're relying on.

 3              THE COURT:  All right.  Okay.  Who's next?

 4              MR. ALVA:  Can I make a brief response, your Honor?

 5              THE COURT:  Let's see if -- let's get though

 6    everybody's arguments first.

 7              MR. COULSON:  Good afternoon, your Honor.  David

 8    Coulson from Greenberg Traurig.  I'm here on behalf of what

 9    we call the director defendants and also Gerard Bernard.

10    However, some of the -- two of the directors are represented

11    by Mr. Hinson who represents Bill White, who is the chairman,

12    and then also Ridgway White who went on the board in I think

13    late 2006, early 2007.  But for the most part I represent the

14    director defendants, and I'm here to address what we're

15    calling the corporate counts or the common law counts.  Now,

16    I'll primarily focus on Counts 1 and 2.  I believe Mr. Hinson

17    will address Counts 3 and 5.

18              And before doing that, just to make sure the record

19    is perfectly clear, your Honor, Count 4 which deals with the

20    Lawrences' newest efforts or deals with the state deal has

21    been voluntarily dismissed by the plaintiffs.  They did so in

22    Footnote 1 on Page 7 of their opposition brief.  And thus,

23    Count 4 is out of this case at this moment in time.

24              Now, I have three principal arguments, your Honor,

25    that I'll address.  First is the standing of the ESOP

 1   participant or former ESOP participant plaintiffs here to

 2   bring any common law claims.  Secondly, I'll address the fact

 3   that those common law claims are defensively preempted by

 4   ERISA and cannot be brought here.  And thirdly if we go to

 5   any fiduciary duties, that these directors based just on the

 6   allegations on the face of the complaint fulfilled their

 7   responsibilities under the business judgment presumption and

 8   the plaintiffs, given the way they pled this complaint, have

 9   not overcome the business judgment presumption.

10          So I would first like to go to the standing here,

11   your Honor.  The plaintiffs here, except for Mary Rafter, are

12   all suing as ESOP participants.

13          THE COURT:  Go ahead.  She's going to have to

14   gather the parties in the criminal case.  But that will, as

15   you saw before, take quite a while.

16          MR. ALVA:  Okay.  Specifically, plaintiffs Johnson,

17   Stanley, Matura, and Texton are suing as ESOP participants.

18   Mr. Roland, by the way, another plaintiff had voluntarily

19   dismissed his claim back in December, and he's not part of

20   this case.  Mary Rafter --

21          THE COURT:  You all may find some uncomfortable

22   associates joining you at defense table.  Mr. Miner is used

23   to the prosecutors so he won't be quite as offended.  But go

24   ahead.

25          MR. COULSON:  Mary Rafter is someone who used to be

```
 1    an ESOP participate.  But when she retired, for whatever
 2    reason, she decided to hold onto seven shares.  So she is, in
 3    fact, a stockholder.  She is the only stockholder or
 4    shareholder of plaintiff here among the class.  Now, she
 5    happens to be one of nine people who fit in that category.
 6    And combined they owned 53 shares, which is .0027 percent of
 7    the outstanding shares.  But Mrs. Rafter is a shareholder.
 8    The rest of these plaintiffs, your Honor, are simply not
 9    shareholders.  Under the trust agreement of Paragraph 10.9
10    the legal and equitable title and ownership of all assets at
11    any time constituting part of the trust fund shall be and
12    remain with the trustee.
13            THE COURT:  When did they distribute the shares?
14    They just have it -- is that upon retirement?  Is that when
15    you get your shares?
16            MR. COULSON:  Yes, Mr. Miner touched on this.
17    There are a number of ways.  But to make it simple, when
18    someone retires, then they can excise a put right.  And so
19    when they exercise their put right, the company then buys
20    back the stock and the stock is retired to the treasury of
21    the company.
22            THE COURT:  But you have to --
23            MR. COULSON:  However, they can hold onto it if
24    they want to.  And Mrs. Rafter, for example, testified that
25    she wanted to have some shares because she enjoyed receiving
```

1    the annual report each year.

2           THE COURT:  So you can keep your shares if you

3    want?  Do most people sell them or keep them?

4           MR. COULSON:  Almost everybody exercised their put.

5    Based on the records we have, only nine ESOP participants did

6    not fully exercise the put and they retained shares ranging

7    from one share to one fellow has 16 shares.  It's only nine

8    people that fit into a category like this.  And they have a

9    total of 53 shares which represents .002 percent of the

10   outstanding shares as of 2005.  Which is, if we ever were to

11   get to class certification, Mary Rafter would not be able to

12   get a class certified given the different interests between

13   people like that and than other types of investors who own

14   shares here.

15           But focusing on these other shareholders, your

16   Honor, they simply -- the other ESOP participants never owned

17   shares.  They are not shareholders and never were.  And as

18   such have no standing under Delaware law to bring direct

19   claims for damages as a stockholder.

20           Now, there are a number of cases cited by --

21           THE COURT:  Somewhere I guess you -- you said

22   they're prospective shareholders.  They're not even active

23   beneficiaries of shares.  They're prospective shareholders?

24   Is that -- one of you wrote that in one of the papers.

25           MR. COULSON:  Yes, all of them were prospective

1    shareholders as of the time when the Lawrences expressed

2    their interest in the company.  And then it's not clear based

3    on the allegations here, since we're sticking to that, as to

4    how many of these people actually sold -- not sold, but

5    exercised their put in between August 2005 and the present.

6    A number of them, however, it's pretty clear have never

7    exercised their put.

8            THE COURT:  So your argument basically is none of

9    them are shareholders, any interest they have they have by

10   way of a plan and, therefore, ERISA preempts the state law

11   claims.  That's basically your argument.

12           MR. COULSON:  Yes, it's basically a little more

13   structured than that in the sense that they lack standing --

14           THE COURT:  I'm sure.

15           MR. COULSON:  -- they lack standing as

16   shareholders, so we can stop right there.

17           And then we'll slide over into preemption and, yes,

18   they're preempted because any -- as your Honor knows, under

19   Section 1144(a) the ERISA preemption is extremely broad.

20   It's one of the broadest defensive preemption statutes out

21   there.  And the test is whether the claims relate to the ESOP

22   plan.

23           And of course all of the rights that any of these

24   people have, including their financial interest, including

25   importantly any right to vote as was discussed earlier, if

1    you're going to have a pass-through voting if there were to

2    be a merger and how they would be treated if there had been

3    some kind of merger or acquisition in terms of what they

4    would receive for the shares, all that runs through the plan.

5    It's impossible for these -- for those plaintiffs to litigate

6    their claims without reference to and reliance upon aspects

7    of the plan.  And, therefore, these plaintiffs' common law

8    claims are clearly preempted.

9              THE COURT:  But apart from the exhaustion argument,

10   couldn't they make those same claims through ERISA?

11             MR. COULSON:  Well, then they do have a host --

12   yes, these plaintiffs have a host of ERISA counts which I

13   will not address, but Mr. Hinson will cover those.  So if

14   exhaustion does not apply, there may be other claims that

15   arise solely under ERISA that these plaintiffs could

16   prosecute.

17             THE COURT:  Okay.

18             MR. COULSON:  Your Honor, just real briefly on the

19   standing issue, because I can anticipate that Mr. Miner will

20   bring up a series of cases that found for purposes of a

21   derivative action that ESOP participants are counted for

22   standing under Delaware Court -- under some decisions in

23   Delaware on the notion of equitable standing.  The notation

24   there is that the corporation itself was harmed and that ESOP

25   participants are, sort of like in horseshoes, close enough to

1    being a shareholder that we're going to allow them to have

2    standing for a derivative claim.  But there's never been a

3    single decision ever decided that we're aware of, and the

4    plaintiffs certainly have cited to none, that allowed an ESOP

5    participant to sue for direct damages as a shareholder.  So

6    basically if they're not shareholders, they have no standing

7    and their common law claims are preempted.

8            Now, that gets us to the common law claims

9    themselves.  In there the business judgment presumption under

10   Delaware law applies.

11           THE COURT:  Well, how do we get to that on a motion

12   to dismiss?

13           MR. COULSON:  Only on Mary Rafter's claims, your

14   Honor.  As I said, Mary Rafter, the facts are, was someone

15   who had been an ESOP participant.  She exercised her put as

16   to almost all of her shares, but she decided to keep seven of

17   them because I believe her testimony was she enjoyed reading

18   annual reports and so forth.  But as pled we have Mary Rafter

19   who is a shareholder.  She's a direct shareholder.

20           THE COURT:  But it seems like it's awfully

21   premature to be deciding that this operated within the

22   business judgment rule.  She's got a claim you concede.  And

23   at a motion to dismiss stage her claim stands, doesn't it?

24           MR. COULSON:  No, your Honor, because they're going

25   to have -- the only claim they have here would be possibly

1    the duty of loyal.  They mention the duty of good faith.

2    Well, Delaware law is clear, as we showed in the brief, there

3    is no such duty.  In terms of this so-called duty of candor

4    or duty to disclose, the Delaware cases that we cited are

5    clear, starting with the Stroud case, that there's no duty to

6    disclose by the board of directors to shareholders unless

7    shareholder action is being required.  For example, if a

8    proxy was sent out or there was to be a vote by the

9    shareholders, it's only -- it's only at that time that any

10   kind of duty to disclose would be triggered.  So those

11   aspects of Count 1 are clearly -- clearly should be

12   dismissed.

13          And then we get to the duty of loyalty.  Now, the

14   plaintiffs focus, your Honor, on basically three things to

15   try to say that there's a duty of loyalty broken.  First they

16   say that the board of directors are entrenched because they

17   want to remain in their positions.  But the case law is clear

18   here, especially with the recent Gantler decision from the

19   Supreme Court of Delaware, that it's not just merely an

20   allegation of entrenchment.  It has to be entrenchment plus.

21   There has to be some other actions by the directors to try to

22   foil any type of acquisition, for example.

23          In that case one of the -- there's only five

24   members of that board, as I recall.  One of them had a law

25   firm that did the business work for the bank.  Another one

 1    had an air-conditioning firm that did air-conditioning work

 2    for the bank and bank clients and so forth.  And the CEO

 3    himself, who's on the board, he actually actively sabotaged

 4    the bidding process by not providing due diligence materials

 5    and so forth.  He did it on more than one occasion.

 6        (Pause in Proceedings.)

 7            THE COURT:  The defendants are here now.  Why don't

 8    you all step back and let the other lawyers and parties take

 9    a seat.

10        (Recess at 3:17 P.M.)

11            THE COURT:  Okay.  Back to civil litigation.

12        (Pause in Proceedings.)

13            THE COURT:  Okay.

14            MR. COULSON:  Very well.  I believe where I left

15    off was that under Delaware law the plaintiffs must plead

16    entrenchment plus.  They must couple their entrenchment

17    allegations which are -- they have to do more than alleging

18    merely that the directors wanted to continue on in their

19    positions as directors.  And they need to couple it with some

20    other efforts or other facts by the directors to show some

21    type of entrenchment where they would act against the

22    interests of the shareholders at large.

23            THE COURT:  Well, don't they -- they basically

24    argue that they have these agreements with the charities to

25    maintain control and that they're trying to sell the stock to

```
 1    the participants at undervalued prices so they can accumulate

 2    more shares themselves.  Isn't that enough?

 3            MR. COULSON:  Not at all, your Honor.  First of

 4    all, the allegations about the agreements are supposed to

 5    be -- they're really directed at Bill White and the Mott

 6    Foundation.  Mr. Aragon will address those, I'm sure, when he

 7    stands to argue.  Although the short story there, and these

 8    are part of the record, is that those agreements do not

 9    prevent the company from changing hands.  All they do is

10    simply require notification.  And they have a termination

11    provision which allows them to be terminated upon six days --

12    six month's notice.  But if we're going to go back --

13            THE COURT:  Do you even have all of those

14    agreements before me?  You're talking about agreements with

15    the charities.  It looked like you all were disagreeing over

16    the percentages of stock.  The plaintiffs have one number.

17    You have another.  Somebody says that the other side's

18    numbers are old.  It just seemed like that was all pretty

19    tough to deal with on a motion to dismiss.

20            MR. COULSON:  Yes, I think that may have been one

21    of the arguments that were made on sort of causality here.  I

22    believe there's a causality argument perhaps asserted by US

23    Sugar that we adopted which is if you add up all of the

24    shares, they do come out to less than 50 percent.  But what I

25    would like to address is the fact that what the plaintiffs
```

1    point to here as some type of lack of independence or

2    self-dealing is this alleged scheme about how under the ERISA

3    when shares -- when the puts are exercised, the company buys

4    back that stock and then retires it to treasury with the

5    mathematical affect that every existing shareholder,

6    including the ESOP, which is the US Trust which is a

7    shareholder, would get a mathematical larger percentage of

8    ownership of the company.  Of course, it tends to be very,

9    very, very tiny.  But that's what they point to.

10           And as Mr. Alva had pointed to, under Aaronson

11    versus Lewis in Delaware a -- what's forbidden is for a

12    director to derive personal financial benefit from a

13    transaction in the sense of self-dealing, this is quote,

14    unquote, as opposed to a benefit which devolves upon all

15    stockholders generally.

16           So to the extent that the plaintiffs can even call

17    this mathematical affect of the stock retirement a benefit,

18    it's one that must devolve upon all stockholders generally.

19    And none of my clients, your Honor, own any shares of US

20    Sugar.  Well, I'm not sure if Mr. Butler -- some people in

21    Mr. Butler's family may.  But for the most part they don't

22    even own shares.  But even if they did, because the

23    mathematical affect of the retirement of stock in the ESOP

24    devolves among all stockholders equally and generally, that

25    cannot possibly be any evidence of self-dealing or of

1    interest or a conflict of interest.  And that's predominantly

2    what they rely on.

3            Now, they also talk about those agreements which I

4    think Mr. Aragon will comment upon in more detail.  But those

5    agreements simply do not -- they're not illegal and do not

6    prevent this company from being sold to anyone.  They're

7    there for a purpose; to alert these charities in the case

8    that there might be someone else who comes in to take control

9    of the company so these charities make sure their abiding by

10   all of the various complicated tax regulations.  It basically

11   gives them a heads up.  And they're allowed to terminate in

12   six months if it's in their interest to want to sell or do

13   anything else.  The shareholder agreements which are part of

14   the record and are referred to in the complaint simply do not

15   prevent the company from being sold or otherwise disadvantage

16   shareholders at all.

17           And then in terms of -- they also point to this

18   claim that -- these allegations that several of the directors

19   who are my clients somehow are beholden to Bill White, who is

20   the chairman.  And this is very similar to the entrenchment

21   allegations.  You have to do more than just show that someone

22   is friends with or has personal contacts with or has -- or

23   who has some kind of business association with someone who is

24   the alleged controller.  You have to do more than that to

25   show they're beholden.

```
 1              The best case to look at is Benihana which is cited

 2      by the plaintiffs themselves on Page 177.  It explains how

 3      this power that Bill White would have to have has to be

 4      unilateral power over the alleged beholden directors to so

 5      influence their life.  And there's no allegation that

 6      Mr. White has that.  Nor are there allegations that Mr. White

 7      ever threatened any of the directors with anything that would

 8      be punitive or damaging to themselves.  So if we just look at

 9      these allegations on the face of the complaint, they just

10      don't get us there to breach the duty of the loyalty.

11              And then, finally, since we are in the context of a

12      possible selling of the company or a possible merger, if that

13      was the way it was to be structured, if we looks at TW

14      Services, Inc., versus SWT, under Delaware law there are two

15      issues for the Court to decide.  One, did the board of

16      directors reach their decision in good faith in pursuit of

17      legitimate corporate interests; and, two, did they do so

18      advisedly.

19              On the face of this complaint the way it's been

20      alleged, the board of directors here rejected the overtures

21      from the Lawrences after receiving advice from an investment

22      banker and from an appraiser, that's all alleged in

23      Paragraphs 55 through 57, before making its decision to not

24      pursue any further negotiations with the Lawrences but rather

25      to do something that's a very legitimate corporate business
```

1    interest, which is to continue on as an ongoing concern as an

2    agricultural company the way US Sugar has operated for 80

3    years.

4         This is not a situation where the board of

5    directors turned away the Lawrences and then decided to sell

6    the citrus juice plant to Bill White's cousin for some huge

7    discount.  There are no allegations of those kind.  The only

8    allegations are that the board of directors decided not to

9    put themselves up for sale after being advised by investment

10   bankers and appraisers that there's a huge value in the real

11   estate of this company.

12        So normally, your Honor, when you have allegations

13   about the business judgment rule being violated, you tend to

14   say, hey, there has to be some fact issues here, let's flush

15   it out.  On this complaint given the allegations, the

16   plaintiffs simply have not overcome the business judgment

17   presumption.

18        I'll just comment very briefly on Count 2, your

19   Honor.  That's this very creative self-dealing and insider

20   trading count that the plaintiffs asserted.  We note that

21   there was absolutely no response to it in their opposition.

22   I'm assuming that's because they realized that there's no

23   legal basis to it.  They try to say that somehow the ESOP

24   participants exercising their put was an insider trade of

25   some type that the directors were involved in is just

 1    factually and legally basis there.  There was no transaction

 2    there.  There's no allegations of scienter as are needed for

 3    insider trading.  And then their self-dealing allegation is

 4    this same allegation about the alleged scheme of having ESOP

 5    participants exercise their put, have the company buy their

 6    shares which are retired to treasury.  Well, the directors

 7    are not participating in that transaction.  That's all set up

 8    by the trust agreement and the plan documents which were all

 9    put in place long before the Lawrences ever came on the scene

10    and of which the directors themselves are not involved in any

11    such transactions.  That cannot possibly constitute

12    self-dealing.  I think the plaintiffs recognize this which is

13    why we heard nothing from them in response.

14             And then, your Honor, I believe Mr. Hinson will

15    address Count 3 which is not directed against my director

16    defendants but rather against Bill White and I believe the

17    Mott Foundation.

18             And then Count 4, as we talked about, was the one

19    dealing with the state deal.  That's been voluntarily

20    dismissed by the plaintiffs.

21             And then Count 5 I allege is conversion, which I

22    think Mr. Hinson will also address.

23             In terms of the ERISA claims, my director

24    defendants and Mr. Bernard are named in a number of those.  I

25    will rely on my papers in that regard and any argument

1    presented by Mr. Hinson.

2              THE COURT:  All right.  Thank you.

3              MR. MINER:  Your Honor, I'll first respond to the

4    defendants' argument on standing, and this relates to the

5    plaintiffs' standing to bring the common law claims.

6              THE COURT:  First, is he right about you all did

7    drop that one count, the Florida count?

8              MR. MINER:  Count 4 is -- yes, sir, our breach of

9    fiduciary duty count.  We note in the footnote that at the

10   time this briefing was done that it was not ripe.  The

11   defendants have been kind enough since the briefing and more

12   recently to make it ripe, so I think it will be a matter for

13   the future for the Court, but it's not before the Court on

14   this motion.

15             THE COURT:  All right.

16             MR. MINER:  On the standing issue, a couple of

17   points.  First of all, Mary Rafter is a direct shareholder.

18   So regardless of whether there is standing for the ESOP

19   participants to bring the common law claims, those arguments

20   don't apply to Mary Rafter.  She has standing as a direct

21   shareholder.

22             2.  Even if the ESOP participants don't lack

23   standing, and I think they do and I'll explain why, this

24   doesn't mean that it's not fatal to their claims.  All it

25   means is they need to be brought as ERISA claims, not as

1    common law claims.  So this is a without prejudice type of

2    issue.

3            But to the substantive point, three, the ESOP

4    participants do have standing to bring the common law claims

5    here.  They're not direct shareholders.  That's correct.

6    They don't own the shares directly.  They're beneficial

7    owners of the shares.  They have the right to the dividends.

8    They have the right to pass-through voting to direct the

9    trustee how to vote, except when we get into these convoluted

10   areas that we were talking about earlier.  They get the

11   shares themselves once certain triggers happen.  They are

12   beneficial owners of these shares.  The trustee -- there's no

13   circumstances under which the trustee ever gets to deprive

14   them of their ownership, just take the shares away from them.

15           So the question then is:  As beneficial owners does

16   that give them standing to bring common law claims?  I've

17   cited cases that support that proposition.  Page 9 of our --

18           THE COURT:  Aren't all of your cases, though,

19   derivative cases?

20           MR. MINER:  They are, your Honor.  And I think if

21   anything that -- our claims are direct claims here.  We

22   acknowledge that.  They're not derivative claims.  If

23   anything, we should have a stronger argument that standing

24   exists in the case where you're bringing direct claims.

25   Standing is always an issue about is the harm that the person

1    who's bringing the claim suffered closely linked enough to

2    them that they really have standing to bring it.  A

3    derivative claim by definition, the harm is really one step

4    removed from the person bringing the claim; the harm suffered

5    by the corporation.  We nonetheless let shareholders bring

6    the claim derivatively.  A direct claim, if anything, I would

7    think the argument for standing is better because it's where

8    the harm is suffered directly by the person.  That's our

9    situation here.

10            THE COURT:  Why is that?  Nobody has suffered any

11   yet, have they?  Have any of these -- these people wouldn't

12   have shares so why would the valuation affect them?

13            MR. MINER:  On -- the common law claims don't raise

14   the valuation issues.  Our argument on the common law claims

15   is that the board of directors breached its fiduciary duty

16   when it didn't extend to the shareholders the Lawrence

17   Group's offer.  If it had followed its fiduciary duties and

18   extended the offer to the shareholders, they would have

19   gotten $293 for their share.  That's their harm.

20            THE COURT:  Well, not these people.  They wouldn't

21   even have shares yet, would they?

22            MR. MINER:  For the ESOP participants it would have

23   gone to the ESOP.  They have the shares -- they have shares

24   in their ESOP account.

25            THE COURT:  So it's the ESOP's claim if anybody's.

```
 1    Isn't that akin to a derivative action?  It still doesn't

 2    seem like they would have a direct action.

 3            MR. MINER:  They do bring their ERISA claims on

 4    behalf of the ESOP, but they suffer the harms individually.

 5    The harm is to their individual accounts.  It's a damages

 6    issues of whether they would receive those damages directly

 7    or whether they would go into their ESOP accounts and that

 8    there would therefore be certain restrictions on them.  I

 9    think that's really more of a damages issue.

10            THE COURT:  Well, take me through it.  If the

11    directors had done what you suggest they should have, they

12    would have submitted this to what a, what, vote of the

13    shareholders?

14            MR. MINER:  Yes.

15            THE COURT:  These individuals wouldn't have had a

16    vote.  I guess the trustee would have had the vote?

17            MR. MINER:  No, we argue that the ESOP participants

18    would have had the vote.  We do not agree with the defendants

19    on that point.

20            THE COURT:  And what provision do you rely on to

21    give them the vote?

22            MR. MINER:  First, under the trust agreement

23    between the trustee and the company starting with Section 4.3

24    on Page 13 which is headed "Voting Company Stock."  The

25    baseline, the presumption is that all voting rights on shares
```

```
 1   of company stock held by the trust shall be exercised by the
 2   trustee in accordance with ERISA and the following provisions
 3   of this section.  And then you can go to Section C.  It says
 4   that all stock held by the trust which is allocated to the
 5   stock accounts of participants shall be voted by the trustee
 6   in accordance with directions received from each such
 7   participant.  That's what they call pass-through voting.  So
 8   it's the participant who gets to instruct the trustee this is
 9   how I want to vote my shares, you vote them that way.  That's
10   the baseline presumption.
11        Then we get into issues about what you were talking
12   about with defense counsel earlier this afternoon is the
13   specific situation when you get involved with a tender offer
14   for company stock.  And under a tender offer it is our
15   argument in our papers that US Sugar does, in fact, have a
16   registration-type class of securities.
17        THE COURT:  But their only interest, however you
18   describe it, is by reason of the plan.  And so doesn't that
19   make it related to the plan in terms of preemption?  Apart
20   from the standing, it sure seems like if you're a participant
21   in the plan, that your interest is subject to ERISA.
22        MR. MINER:  I think that the plan is there.  You
23   have to look at the plan.  But that doesn't mean that all of
24   their claims are necessarily preempted by ERISA.  And I think
25   the case --
```

1            THE COURT:  Hasn't the Court said it's pretty broad

2     preemption and as long as it's related to the plan, then --

3     here it exists by reason of the plan, the interest.  How can

4     it not be related?

5            MR. MINER:  Right.  Our argument is not that the

6     board of directors violated any provision of the plan in

7     their handling of the Lawrence Group's offer.  Our argument

8     is that they violated their fiduciary duties that they owed

9     to all shareholders when they considered the Lawrence Group's

10    offer; Mary Rafter, other shareholders, as well as the ESOP

11    participants.

12            And if you look at it from sort of a direct

13    shareholder's perspective, Mary Rafter clearly has a claim,

14    can assert a claim for breach of fiduciary duty against the

15    board of directors of the company in which she's a

16    shareholder.  ESOP participants, it's the exact same claim

17    that they are asserting as Mary Rafter is asserting.  Exact

18    same harms they say happened; the board's handling of the

19    Lawrence Group's offer.  So the nature of the claim is for

20    breach of fiduciary duty, not breach of any of the ERISA

21    duties to the ESOP participants.

22            And the Ervast case, E-R-V-A-S-T, in the Eleventh

23    Circuit is a good example of that.  It's not a perfect

24    example because that case dealt with super preemption which

25    is preemption that's involved when you're trying to decide

```
 1   whether there's federal court removal jurisdiction.  It

 2   didn't deal with defensive preemption.  But other than, it's

 3   on pretty close point.

 4         One way the Courts have put it that gives sort of a

 5   succinct description of the two different duties at issue,

 6   taking this from the case of Williams versus Cypert, cited in

 7   our brief, they say the state law and ERISA duties are

 8   parallel but independent.  As a director the individual owes

 9   a duty defined by state law to the corporation's

10   shareholders, including the plan.  And as a fiduciary the

11   individual owes a duty defined by ERISA to the plan and its

12   beneficiaries.  Thus, the state law does not affect relations

13   between ERISA fiduciary in the plan or plan beneficiaries as

14   such.  It affects them in their separate capacities as

15   corporate director and shareholder.  So they're separate and

16   in some ways parallel duties; fiduciary duties, ERISA duties.

17   But just because someone is an ESOP participant doesn't mean

18   that the board of directors can't owe them both.

19         Your Honor, I'll turn to the argument raised about

20   the fiduciary duty counts.  And this is essentially the

21   argument that the count should be dismissed for failure to

22   state a claim.  You asked on that point how do we get to that

23   on a motion to dismiss.  And that issue, being the issue of

24   whether we've overcome the presumption of the business

25   judgment rule, is a fact-intensive inquiry.  And really I
```

1    think the question at this point is have we alleged

2    sufficient facts to clear this initial hurdle.  I think we've

3    alleged sufficient facts to clear the hurdle with ease.

4          This is not -- we have alleged a situation that is

5    not an ordinary case of entrenchment by a board of directors

6    or a company.  The Courts have said, plaintiffs, you can

7    allege entrenchment in any case.  Any board of directors

8    would like to stay on as the board.  Any CEO or chairman

9    would like to stay on as the chairman.  You can say that

10    about any company in the United States.  What we have alleged

11    is that this is no ordinary situation.

12          This is a company that was founded by the Mott

13    family back in 1931.  Up until this day, for the past 75 plus

14    years, the control of the company and the chairmanship of the

15    company has basically passed by hereditary succession to the

16    descendents of its original founder.  To this day the

17    chairman is married -- is a member of the Mott family by

18    marriage.  The board of directors has three members of the

19    Mott family on it, including the most recent addition is the

20    chairman's 27-year-old son who was added a year or two ago.

21          When you look at the other members of the board of

22    directors, this is a board that would make Senator Sarbanes

23    and Senator Oxley croak at its entrenchment.  The chairman

24    has been on the board for 37 years.  Other of the directors

25    have been on there for 18 years, 16 years, 14 years, 12

1    years, 12 years.  This is the definition of an entrenched

2    board of directors of a corporation.

3         Beyond that we allege that particular directors

4    beyond the three family members are also not disinterested;

5    in other words, they owe loyalties or allegiances to the

6    family members that make them so that you cannot count them

7    as disinterested directors.  You've got the CEO of the

8    company who is dependent on his salary, his bonuses, his

9    continued tenure in the job on the chairman of the company

10   who's a Mott family member.  He is a board member.  You have

11   got another board member who works for the chairman in an

12   outside business called MFO Management.  His job is to head

13   the Mott family office.  And you've got another board member

14   whose outside activity is serving on the board of trustees of

15   the Mott Foundation.

16        We allege this all in the complaint to show that

17   these are not disinterested directors.  And by doing so, and

18   I think we meet that initial hurdle with ease, that rebuts

19   the business judgment presumption.  And you can't just go --

20   you can't just sort of look at the complaint and say Delaware

21   business judgment rule applies to decisions by the corporate

22   board.  You can't state a breach of fiduciary duty claim.  I

23   think we've alleged sufficient facts to overcome those

24   initial hurdles.

25        THE COURT:  All right.  Thank you.

1          MR. COULSON:  Your Honor, rather than provide a

2    rebuttal I think it would be more efficient to go right to

3    Mr. Hinson's argument.

4          THE COURT:  Okay.

5          MR. HINSON:  Your Honor, I appreciate your time

6    this afternoon.  I do represent the gentlemen who have been

7    mentioned many times in this hearing as someone that these

8    gentlemen are trying to put the black hat on, William S.

9    White, Bill White, and his son Ridgway White who is also a

10   member of the board of directors.

11         Your Honor, I would like to start, really, if I can

12   where plaintiffs' counsel left off with this notion that

13   there's parallel tracks, I think he called it, between

14   shareholder rights and fiduciary duties that the board owes

15   to shareholders and yet there's also these ERISA duties over

16   here that they owe to ESOP participants and that that somehow

17   is some reason why the claims of the ESOP participants are

18   not preempted.  It seems to me like what he has established

19   for us here today is that the corporate claims, as we've been

20   talking about them, just recently arise solely from corporate

21   fiduciary duties.  They don't arise from ERISA duties.  The

22   board of directors here is the one that turned down the

23   expression of interest from the Lawrences.

24         Excuse my voice, your Honor.  I'm struggling a

25   little bit.  I had a cold this weekend.  The board of

1    directors is the one that turned down this expression of

2    interest.  They did so, of course, in their capacity as a

3    board of directors.  They're not wearing any sort of ERISA

4    fiduciary hat when they do that.  And there's no ERISA

5    fiduciary claim that arises from all of these corporate law

6    issues having to do with --

7         THE COURT:  Why not, though?  Assuming that -- I

8    mean, the board of directors -- a third of your shares are in

9    this employee stock ownership plan.

10        MR. HINSON:  Yes.

11        THE COURT:  Why don't you owe -- it may not be

12   described in identical fashion as the duty you would owe a

13   shareholder, but why don't you basically owe the same duty, I

14   guess, to treat them fairly with respect --

15        MR. HINSON:  Oh, you do.

16        THE COURT:  Whether you call it an ERISA claim or a

17   shareholder claim it seems like it's the same thing.

18        MR. HINSON:  Oh, absolutely, your Honor.  I'm not

19   suggesting that the board does not owe the same duty to the

20   ESOP as a shareholder that it owes to all other shareholders.

21   It absolutely does.

22        Those claims if they exist, if there are breach of

23   fiduciary duty claims that exist on behalf of the ESOP, the

24   person with standing is sitting right here, Scott Schneider

25   and his client US Trust.  That's the trustee.  That's the

```
 1   shareholder of those shares.  And one of their fiduciary

 2   duties, quite frankly, is, in fact, to bring that type of

 3   claim if, in fact, that claim is the right thing to do, is

 4   the prudent thing to do under ERISA.

 5           THE COURT:  But if a corporation doesn't bring a

 6   claim it has, a shareholder can bring a derivative claim on

 7   behalf of the corporation.  I guess what he's suggesting is

 8   that an ERISA participant ought to be able to bring an action

 9   on behalf of the plan.

10           MR. HINSON:  The problem is they're two steps

11   removed.  They're two steps removed from that direct harm

12   that he's talking about.  The direct harm comes to the ESOP

13   itself and the shares still own by the ESOP, and that is

14   why --

15           THE COURT:  Well, doesn't the participant quarterly

16   get a statement that gives a monetary value for their share?

17           MR. HINSON:  Absolutely, your Honor.

18           THE COURT:  And that would be affected by the

19   failure to accept this offer, wouldn't it?

20           MR. HINSON:  Actually, no, your Honor.  It would

21   not be affected.  The values that are listed in that

22   statement are the ones derived from the Houlihan analysis

23   approved by US Trust and approved by the committee.  And

24   there's no harm that's been alleged to those values as a

25   result of the Lawrence interest or anything else.  I mean,
```

1    those shares are still owned by the ESOP.  They still have

2    that value.

3            THE COURT:  But they're saying --

4            MR. HINSON:  The claims that they're bringing under

5    ERISA, your Honor, have to do with those shares that were

6    sold and that were sold for that lower value.  Those are the

7    proper providence, if you will, of the ERISA claims.  And

8    that's the way they've pled it.  They've only pled those

9    claims on behalf of former participants who sold their shares

10   under ERISA.

11           You can sort of put the claims in this case into

12   two different buckets.  One bucket is the ERISA claims.

13   Those are on behalf of people who sold their shares

14   supposedly for too little, and they've got all these

15   valuation issues attached to them.  That's what we say should

16   be exhausted and should be brought before this Court --

17           THE COURT:  I follow all of that.

18           MR. HINSON:  Okay.

19           THE COURT:  But if I'm a participant -- I don't

20   have shares yet but I have an account and my account has a

21   value --

22           MR. HINSON:  That's right.

23           THE COURT:  -- and as a member of that plan aren't

24   I affected by the directors' refusal to accept this offer?

25   Assuming they should have and should have taken the $293 a

```
 1    share, I got hurt, didn't I?

 2              MR. HINSON:  No, your Honor.

 3              THE COURT:  My account doesn't have as big a number

 4    as it would if I had -- as if they had.

 5              MR. HINSON:  You have no present right to that

 6    value in your account, your Honor.  That's a value that's

 7    assigned based on the shares that are allocated to you.  But

 8    until you retire and until the terms of the plan say you can

 9    get your hands on those shares -- remember, this is a

10    regulated retirement plan under ERISA.  They can't just walk

11    up and say, hey, Mr. Trustee, I want my shares today.  That

12    doesn't happen.  They can't do that.

13              THE COURT:  Couldn't I retire?  If the number in my

14    account was big enough and assuming I had worked long enough,

15    couldn't I say it's time for me to go?

16              MR. HINSON:  If you were old enough, you can do

17    that, your Honor.  And you can get your hands on those shares

18    through that process.  But then again, you come to the plan

19    and based on what the plan says you get what's in the plan

20    for you.  It's all based on the plan.

21              And the point, your Honor, is there is a trustee

22    there and the trustee has fiduciary duties to all of these

23    people.  And one of those fiduciary duties is to protect

24    those people, to protect their interest.

25              So we're two steps removed.  They sued the trustee
```

1    saying that the trustee didn't properly protect the interest.

2    That's fine.  They're permitted to do that under ERISA.  But

3    with regard to these shares that are still in the trust, your

4    Honor, there are no shareholders yet other than the trust,

5    and there are shares allocated to them but you can't go and

6    put your finger on this share or that share that they

7    technically own.  They don't technically own them at this

8    point.

9         THE COURT:  So a plan participant simply can't

10   bring an action on behalf of the plan against the board of

11   directors for failure -- for fiduciary duty; is that right?

12        MR. HINSON:  No, that's the role of the trustee.

13   It's the role of the trustee to bring that type of claim

14   because it is the shareholder that has standing to bring that

15   kind of claim under the corporate law.  Under those corporate

16   fiduciary duties that are owed to shareholders, that's the

17   role of the trustee.  It's not the role of the participant.

18   Participants get to sue the trustee if they breached their

19   fiduciary duties under ERISA.  That's why all of these

20   corporate law claims are preempted here, because ERISA

21   establishes the rights of these plan participants, not

22   Delaware corporate law.

23        It doesn't leave them without a remedy again.  It

24   doesn't leave them without a remedy.  They can sue under

25   ERISA if there's been a breach of fiduciary duties by one of

1    the fiduciaries of this plan.

2            THE COURT:  They can sue the trustee.  Can they sue

3    the directors under any theory?

4            MR. HINSON:  The directors -- they have sued the

5    directors, your Honor, under ERISA claiming that the

6    directors were involved in the appointment of other

7    fiduciaries.  That's the role that the directors play here,

8    an ERISA fiduciary role, is that the directors appointed

9    ERISA fiduciaries in this plan.  Particularly they appointed

10   that ESOP committee.  And when you as a director appoint an

11   ERISA fiduciary, that is -- we would acknowledge that's a

12   fiduciary act and you wear a fiduciary hat when you do that.

13   So the directors can be sued here under ERISA as a result of

14   that appointment or a failure to monitor those people that

15   they appointed.

16           In turn, the ESOP trustee appointed the -- excuse

17   me, the ESOP committee appointed the trustee.  And the ESOP

18   committee has a duty to monitor that trustee, to make sure

19   that the trustee does what it's supposed to do.

20           So there are ERISA fiduciary roles for both the

21   ESOP committee and the board of directors in fact.  But

22   they're limited roles.  And they're not the same role as

23   where they're sitting back wearing their corporate hat as

24   board doing corporate things that are unrelated to the plan

25   as this was.

```
 1              And that brings me to one other point I wanted to

 2   make, your Honor, because I've heard it a lot today and we

 3   read a lot in the plaintiffs' papers about this scheme and

 4   conspiracy that supposedly my client, Bill White, put in

 5   place to steal the ESOP shares essentially and to use the

 6   company's money to make the ESOP go away and in that way they

 7   would be using the company's money essentially to gain a

 8   larger interest for themselves in the company.

 9              Your Honor, that scheme that they are describing is

10   one that's mandated by Congress.  Congress created that

11   scheme.  Congress said if you have a private company like

12   this one and you have an ESOP like we've got, you have to

13   either buy back those shares in one of two ways; you can buy

14   them back by the company or you can have the plan buy them

15   back.  Of course, those are very different decisions and very

16   different outcomes.  If the plan buys them back, then you're

17   going to have to buy them back again because they'll get

18   reallocated to somebody else and you're providing more

19   benefits.

20              The point here is that ESOP, your Honor, is an

21   employee benefit, and you --

22              THE COURT:  I don't think their criticism is of

23   buying back the shares.  It's at the price at which they buy

24   them back.

25              MR. HINSON:  Okay.  And if what they're saying is
```

 1    that you're buying them back at too low a price and that,

 2    therefore, Mr. White is benefiting because you're paying too

 3    low, as has already been said, of course, everybody benefits.

 4    Every remaining shareholder in the company, every single one,

 5    including all of the ESOP participants that remain.  The ESOP

 6    remember, your Honor, is the single largest shareholder in

 7    this company.  It has more shares than anybody else.  And

 8    that ESOP actually gains more than anybody else if their

 9    theory is true.

10            Now, of course, the ESOP itself has less shares

11    because of the person redeeming those shares and being bought

12    back by the company.  That's ERISA, though.  They can't

13    complain about that part of it.  That's the way ERISA works.

14    ERISA requires that there be somebody to buy back these

15    private company shares so that people can get their benefits.

16    And ERISA says that the company can do that, and it says that

17    the ESOP can do that.  The plan or the company.  Those are

18    the only two options.  And there's nothing sinister about

19    that at all, your Honor.  It's just a benefit decision.  It's

20    a benefit decision as to whether or not you want to provide

21    more shares to the ESOP so that they can be given away to

22    more employees as an employee benefit.  Buying them back is

23    mandated by Congress.

24            This notion that somehow my client has the sinister

25    scheme is ridiculous.  It's a scheme created by Congress.

1    And there's no way that my client, as has been pointed out,

2    of anybody could ever actually benefit from that scheme

3    because of this Excess Business Holdings Rule.  This Excess

4    Business Holdings Rule limits the Mott Foundation, one of

5    defendants here, and my client, because he's a related party

6    to the Mott foundation and his family -- those two entities

7    are looked at together, and they can never own more than a

8    certain percentage of shares in that company.

9              THE COURT:  How can we deal with that at this

10   stage?

11             MR. HINSON:  We're not trying to deal with that at

12   this stage, your Honor.  I'm just trying to explain to you

13   that this whole sinister notion is really silly.  As its base

14   it's really kind of silly.  And I think when we get to the

15   merits you'll see that.  But there's been some confusion

16   about that and some confusion about what claims really are

17   being brought under ERISA and what claims are being brought

18   under corporate law.

19             My point is simply this.  The claims being brought

20   under ERISA are all about those shares that have been bought

21   back over time.  The claims that are brought under corporate

22   law are all about those shares that stay in the ESOP.  Those

23   claims are the ones that are preempted.  And those are the

24   claims that these people do not have standing to bring

25   because the trustee has that standing.  That's how we started

```
 1    down this road.  And I apologize for that little diversion,

 2    because that isn't what I'm supposed to argue.

 3             Here is what I'm supposed to argue.  What I'm

 4    supposed to argue is Count 3.  Count 3 of the complaint is

 5    unique to my client and also the Mott Foundation.  Bill White

 6    and the Mott Foundation are alleged to be --

 7             THE COURT:  Excuse me a second.

 8        (Pause in Proceedings.)

 9             THE COURT:  Okay.  Apparently you all got the note.

10    I notice everyone came in.  They reached a verdict.

11             MR. HINSON:  Okay.

12             THE COURT:  Are the defendants still nearby?

13             THE COURTROOM DEPUTY:  They're on their way.

14             THE COURT:  Until they get here go ahead and

15    continue with your argument, please, with the understanding

16    you're going to probably be interrupted in a second.

17             MR. HINSON:  Sure.

18             Your Honor, my argument really focuses on Count 3

19    and only Count 3 for now, and that's the claim that is based

20    on the allegation that Bill White and the Mott Foundation

21    acted in the oppression of the minority shareholders because

22    they were majority shareholders and exercised control over

23    the company and, therefore, had fiduciary duties to the

24    minority.  This is sort of a very special area of corporate

25    law where if someone has a minority interest, they can bring
```

1  a claim for breach of fiduciary duty against a majority

2  shareholder who has breached the fiduciary duty to the

3  minority.

4         My first argument, your Honor, is that this claim

5  is very easy to dispose of because it relies on math.  Math

6  is easy.  There's no real dispute about math.  Folks can

7  generally agree on what adds up to what.  And here the math

8  that's alleged in their complaint, and so I am sticking with

9  the allegations in their complaint, the math does not add up

10  for the plaintiffs.

11         We start with their allegation of what my client,

12  Bill White, owns.  What they actually say is that my client's

13  family owns approximately 4 percent of the shares.  Now, I

14  don't think it's really fair, but we're not going to get into

15  whether or not they can actually claim that just because

16  someone is a family member of Bill White he controls their

17  shares.  That's for another day.  We didn't raise that

18  argument.  But if you assume my client and his family own

19  4 percent of the shares, then you add the Mott Foundation

20  which owns 19 percent of the shares.  Four plus 19 where I

21  went to school equals 23.  If you then add -- that's it.  23.

22         THE COURT:  You're saying they don't get to

23  51 percent.  Is that the argument?

24         MR. HINSON:  They don't get there.

25         THE COURT:  Didn't they say somebody is counting

1    wrong or using old numbers?

2          MR. HINSON:  Here is what they say, your Honor.

3    They say that they get there because they get to add in the

4    Children's Health Center in Flint and the Community

5    Foundation in Flint.  The Children's Health Center in Flint,

6    your Honor, is alleged in the complaint to own 22 percent of

7    the shares.  Now, the way they get there, by the way, is

8    through these agreements that have been referred to in the

9    press and I think in their papers as well as illegal

10   agreements.  I want to take the mystery off these agreements

11   for you as well, your Honor, because they are in no way

12   illegal or improper at all.  All those agreements do, as has

13   already been mentioned, is require six month's notice --

14          THE COURT:  Well, I guess my basic -- shouldn't

15   that be an issue for summary judgment?  How can I figure out

16   who's right on these competing papers?

17          MR. HINSON:  Your Honor, I'm -- all I'm asking you

18   to figure out is the math.  I'm not asking you to say that

19   the agreements don't control anything, although on their face

20   they don't have -- they're not voting agreements.  They're

21   just having to do with sale.  And I was just trying to

22   explain them to you.  But I will not go into that at all.

23          Just stick with the math.  I'll give them

24   22 percent.  Okay.  So 22 plus 23 comes up to 45.  And we're

25   still not there.

1          THE COURT:  But at the end I think they say that

2    these are old numbers and don't count all of the shares that

3    have been purchased in the interim and that they need to be

4    able to figure out the exact amounts.  Isn't that what they

5    said?

6          MR. HINSON:  Well, your Honor, they have to allege

7    it.  They don't just get to say it in their papers.  We're

8    here on a motion to dismiss and we're here looking at the

9    complaint and testing the complaint.  And nowhere in their

10   complaint do they make any allegation other than those three

11   that I've just described; 4 percent, 19 percent, and

12   22 percent.  They never make any allegation about what the

13   Community Foundation owns.  None.  They are saying my client

14   controls the majority of the shares and yet they don't make

15   allegations in the complaint that add up to a majority.

16   That's my -- it's math.  It is pure math, your Honor.

17          And it's their complaint and their allegations.  If

18   they're going to claim I've got a majority, I think they've

19   got to allege that I've got a majority.  What they allege is

20   something less than a majority.  That's point number one.

21          Your Honor, point number two on this claim is --

22   keep in mind, this is a majority shareholder supposedly

23   oppressing a minority shareholder.  In this instance, your

24   Honor, there was no shareholder action.  The allegations in

25   the complaint are all about board action.  They allege that

1    the board rejected the expression of interest from the

2    Lawrences.  The board did that.  That's not a majority

3    shareholder doing anything.  The majority shareholder could

4    only oppress the minority through an action as a shareholder.

5    And they don't allege any action as a shareholder.

6           All those cases about majority oppressing minority

7    relate to actions taken by majority shareholders to freeze

8    out or do bad things to minority shareholders.  They don't

9    allege that here.  They're alleging board action which is

10   subject to the fiduciary duties attendant to boards, not

11   subject to shareholder duties from one shareholder to

12   another.  So without any --

13          THE COURT:  Is that just an allegation problem?  If

14   you're a large shareholder and happen to be on the board and

15   control the board and through that acted in a way that

16   benefited you and to the detriment of a minority shareholder,

17   haven't you basically stated the substance of that claim?

18          MR. HINSON:  You've stated a breach of fiduciary

19   duty by the board in that circumstance, your Honor.  That's

20   Count 1.  Okay?  This is Count 3.  It's a very different

21   claim.  It's a claim that a majority shareholder violated

22   majority shareholder fiduciary duties --

23          THE COURT:  But how do you do that?  How do

24   exercise that authority except through the machinery of the

25   corporation?

```
1              MR. HINSON:  Typically there's a transaction that

2    the majority forces down the throat of the minority.  The

3    majority votes for something that hurts the minority.

4              THE COURT:  Through a shareholder agreement as

5    opposed to a board action?

6              MR. HINSON:  Yes.  Absolutely.  Absolutely.  The

7    shareholder -- if you look at any and all shareholder control

8    claims, your Honor, I think you will find that every single

9    one of them relates to shareholder action that breached the

10   fiduciary duty by that shareholder or group of shareholders

11   to minority shareholders.  But it's not board action.  Board

12   action is subject to board fiduciary duties, and that's what

13   Count 1 is all about.  This is Count 3, and it doesn't

14   involve shareholder action.  That's pretty clear, I think.

15             There never was a transaction here.  This would

16   work for them if Bill and the Mott Foundation and the other

17   charities that they say Bill somehow controls somehow was

18   able to force the company into a transaction that hurt the

19   ESOP or the ESOP participants in some way.  That would be a

20   valid basis for this Count 3 type claim, because then

21   shareholders would be doing something, transacting some

22   business on behalf of the company that would violate their

23   fiduciary duties to minorities.  Quite frankly, right here,

24   it just doesn't exist.

25             Point number three is even if Mr. White did have a
```

1    majority, which he doesn't mathematically, even if it somehow

2    involved shareholder action, which it doesn't because no

3    shareholder action happened here, never came to a shareholder

4    vote at all, Delaware law is absolutely clear that you cannot

5    sue a majority shareholder for failing to sell the majority

6    shareholder stock.

7         If you think about it, that's -- the nature of

8    their claim in Count 3 is you should have allowed us to sell

9    our shares to the Lawrences.  The Lawrences offer, if you

10   want to call it that, or their expression of interest or

11   whatever it was was only for 100 percent of the shares.  And

12   what they're essentially saying is you as shareholders who

13   controlled this company didn't allow us to sell our shares.

14   Well, majority shareholders are never required under Delaware

15   law to sell their shares.  That, of course, would not be

16   right.

17        I mean, you think about that common sense-wise.

18   You can't force me if I own a majority of the company to sell

19   it just in order to benefit the minority.  I have the right

20   to either buy or sell my shares freely without any concern

21   about a minority interest.  Now, I can't use those shares to

22   force shareholder action that harms a minority.  But what

23   they're alleging here is the failure to have a transaction,

24   and that's the failure to sell, and it can't be that my

25   breach of fiduciary duty in this circumstance is failing to

```
 1   sell.

 2            That case, your Honor, if you want to take a look

 3   at it, is Bershad vs Curtiss-Wright Corp.  That's a Delaware

 4   case, 1987.  And I think it's directly on point.  It says the

 5   Delaware -- the Delaware Supreme Court said you cannot force

 6   a majority to sell its shares merely because the sale would

 7   profit the minority.  That is just not part of Delaware law.

 8   And so this claim, I believe, fails as a matter of law.

 9            Last thing on this one, your Honor, and this is

10   slightly involving Count 3.  Count 3 makes some mention of

11   misrepresentations.  Again, as though -- well, first of all,

12   they don't make any allegations, any specific allegations

13   with regard to any misrepresentations by my client, Bill

14   White, and they don't even mention Ridgway White.  But

15   there's no allegation that Bill White misrepresented

16   anything.

17            Rule 9(b) does apply under Delaware law to claims

18   like this that are majority/minority oppression claims or

19   fraud.  And I think it's absolutely clear that they would

20   have to comply with 9(b).  All they do is refer to 87

21   paragraphs in the complaint as the specifics of how my

22   clients somehow fraudulently misrepresented something to the

23   shareholders when, in fact, you look through all 87

24   paragraphs, and there's not one allegation about what my

25   client actually said that was a misrepresentation.
```

```
 1              What they claim, of course, is that he failed to

 2   disclose something to shareholders, that duty of disclosure

 3   we've already talked about under the corporate law, and I

 4   won't go into it.  But there's no shareholder duty from one

 5   shareholder to disclose to another.  It just isn't anywhere

 6   to be found in the law.

 7              THE COURT:  Okay.  We need to break.  This one is

 8   going to be a little longer.  They reached a verdict.

 9        (Recess at 4:12 p.m.)

10              MR. HINSON:  I'll be very brief, your Honor.

11              THE COURT:  Well, let's let them get their things.

12        (Pause in Proceedings.)

13              MR. HINSON:  Your Honor, just to sum up where I

14   was, I think I was talking about the misrepresentation claims

15   against my client, Bill White, and pointing out that none of

16   the 87 paragraphs that they referred to by reference actually

17   mentioned any actual misrepresentation or statement for that

18   matter made by my client, Bill White.  All of them were

19   actually made by other individuals.

20              And so since Delaware law requires that they plead

21   them with particularity under 9(b), I don't believe they've

22   complied with that.

23              Next, your Honor, is Count 5, conversion.  And the

24   issue here, I think, it really all comes down to whether or

25   not Delaware law applies.  Although, we think, frankly, even
```

```
 1    under Florida law they have not actually pled a proper claim

 2    for conversion here.  And we do believe that Delaware law

 3    does apply.  I frankly think Delaware does apply.  I think

 4    they concede it.  Maybe not.  But the right -- I mean, the

 5    property that they allege has been converted is the right to

 6    sell the shares in response to the Lawrence Group offers.  If

 7    you think about that, your Honor, the right to sell the

 8    shares.  Quite frankly here, your Honor, there was never

 9    anything that they could have sold to.  As ESOP

10    participants -- these are active participants now, your

11    Honor, so they don't have the shares, remember.  There was no

12    right that they had to sell the shares, and for all of the

13    reasons that have been explained by Count 1 and Count 2 which

14    I won't go into.

15            It's a very technical argument having to do with

16    the restatement conflict of laws.  Quite frankly, your Honor,

17    the general rule under all of them is that the law of the

18    state of incorporation applies particularly where it involves

19    matters involving a corporate relationship to its

20    shareholders.  I can't think of anything more central to that

21    relationship then whether shareholders have a right to sell.

22    And so we think for sure Delaware law does apply.  And quite

23    frankly, your Honor, even under Florida law there really

24    isn't a conversion here.

25            I mean, Bill White does not have anything in his
```

1    hands that in rights belongs to their client.  He hasn't

2    stolen anything from them.  He hasn't taken anything from

3    them.  They still have their ESOP shares.  They're still

4    sitting in the ESOP.  And, frankly, right now they're the

5    subject of this Florida transaction that's proposed and

6    whatever else might happen to the company in the future.  So

7    it's not as though the tort of conversion really fits here.

8    I mean, I'm not exactly sure why they're stretching, but

9    they're stretching here.  And it really does not work.

10          The last thing I would say is that, of course,

11   there is some case law out there even under Florida law that

12   says the essence of a conversion action is really not so much

13   the taking but it's the failure to give it back.  And here,

14   of course, they've made no demand.  They haven't alleged any

15   sort of demand.  They've just sort of walked in and said in

16   some esoteric way my client has taken the right that they had

17   to sell their shares.  And, in fact, we don't think that that

18   works under either Florida or Delaware law.

19          Finally, your Honor, and I do mean finally, is

20   Count 13, and this is Section 510 of ERISA.  I don't know if

21   you have any questions about that issue, your Honor.  But

22   again, it's specific to my client, Bill White, and also to

23   the CEO of the company, Robert Buker.  Those two gentlemen in

24   addition to the company have been sued under Count 13.

25          We are not moving to dismiss the claims against the

1   company under Count 13 for that reason.  They're being moved

2   to dismiss because of exhaustion and what you've already

3   heard.  But the claims against the company we would

4   acknowledge are at least ripe under Section 510.  But the

5   Eleventh Circuit has made it very clear that only the

6   employer can be sued under Section 510 of ERISA, not people

7   like the chairman of the board of the employer or the CEO of

8   the employer because they're alleged somehow to be involved

9   in the decision whether or not to terminate a particular

10  individual.

11          The case I'm relying on for that, your Honor, is

12  Byrd versus McPapers.  It's cited in our cases, but it's

13  Eleventh Circuit, 1992.  And it's just as clear as it can be,

14  that there is, in fact, no claim under Section 510 against

15  anybody other than the employer.  And, therefore, your Honor,

16  we would say that that claim ought to be dismissed as well.

17          Also, last thing is that claim relates to this same

18  scheme that Congress put in place about having to buy back

19  shares, and that's something that the company does, not my

20  clients.

21          Thank you very much.

22          THE COURT:  All right.  Thank you.

23          MR. MINER:  That argument began with Count 3, which

24  is our claim for breach of fiduciary duty against the Mott

25  Foundation as majority shareholder and against William S.

1    White as its chairman.  So let me first respond to some of

2    the points that were made on that.

3         First, the math point.  I think the response is

4    pretty straight forward.  In Paragraph 36 of the consolidated

5    complaint we allege that the Mott Foundation directly owns

6    approximately 19 percent of the shares of US Sugar and the

7    Mott White family directly and indirectly owns slightly more

8    than 4 percent of the shares.  However, they effectively

9    control 51 percent or more of the outstanding shares.  We go

10   on to say that's because of the agreements they have with the

11   Mott Children's Health Center and the Community Foundation of

12   Greater Flint.  What we did not do -- so we do allege that

13   they effectively control 51 percent or more of the

14   outstanding shares.  It's in the complaint.

15        They're right.  What we don't allege is how much of

16   that is made up of the Community Foundation of Greater Flint.

17   All we said is that they are part of that total.  We stand by

18   that.  Discovery has borne it out.  But they're right.  It's

19   not alleged anywhere in the complaint.  I don't think that

20   makes it defective.  I think it's enough for us to allege

21   they control 51 percent or more.  But on the math point if we

22   need to put in what the Community Foundation of Great Flint's

23   ownership percentage was at the relevant period of time, we

24   can do it.

25        The second point was that you can't make a claim

```
 1   against the majority shareholder if there's no shareholder
 2   action.  We believe there was shareholder action here.  The
 3   majority shareholder we allege is the Mott Foundation when
 4   you combine these other shareholder interests with it.  The
 5   Mott Foundation, of course, can't do anything on its own.  It
 6   only can act through its agents.  And its agent is William
 7   White who we allege is the chairman of the board and who has
 8   dominated and controlled the decision-making in this whole
 9   process.
10        So the -- there's many ways you can have
11   shareholder action.  You can have a shareholder vote.  I
12   suppose they could dream up some other ways of shareholder
13   action.  But the shareholder action here is that the majority
14   shareholder acting through its agent, its representative on
15   the board, William White, controlled the board and controlled
16   the decision-making that we allege breached the fiduciary
17   duties owed to the plaintiff.
18        THE COURT:  Well, but that would be an action he
19   took as a director.  Is there any case that says that a
20   director who happens to have that -- you know, have or
21   control a majority of shares can be sued then as a
22   shareholder for his actions?
23        MR. MINER:  You know, we've sued the Mott
24   Foundation as the shareholder.  We've included -- William S.
25   White is also a director.  So he's included already in
```

1  Count 1.

2          THE COURT:  I assume, I guess, Mr. Aragon will get

3  to that.  I don't see how that helps him, the fact that

4  the -- the Mott Foundation apparently didn't do anything

5  other than own a bunch of shares.  And so it seems like

6  you're saying that because they plus White controlled

7  51 percent, which they may or may not have, but therefore any

8  action he takes as a director subjects himself to liability

9  as a shareholder.  Is that -- can that be the law?

10          MR. MINER:  We allege that when he's taking action

11  that furthers the interests of the shareholder that he

12  represents and the majority shareholder, that the majority

13  shareholder cannot be held responsible for it, yes.

14          THE COURT:  Is there a case that you think deals

15  with that?

16          MR. MINER:  I think it -- let me pull my brief out.

17  I think it stems from basic agency principles, your Honor.

18  The Mott Foundation is an entity.  It can't do anything on

19  its own.  It's an entity.  Just as US Sugar can't.  It can

20  only act through its agents.  And its agent, we allege in

21  this case, is William S. White who's its chairman, chairman

22  of the Mott Foundation, and its representative on the board

23  of directors.

24          THE COURT:  It just seems like the cases I've seen

25  in this area the shareholder through a shareholder's

1    agreement or something, majority shareholders are harming the

2    minority shareholders not through their representatives on

3    the board taking corporate actions.  It seems to be a

4    distinction that makes a difference.

5             MR. MINER:  All right.

6             THE COURT:  If there is a case, I'm happy to look

7    at it.  Do you want me to --

8             MR. MINER:  The best use of time would be I'll take

9    a look so not to do it before the Court.  I'll submit

10   anything supplemental on CM/ECF so that all parties get it as

11   well.

12            THE COURT:  All right.

13            MR. MINER:  On the Rule 9(b) argument, you know,

14   stating with particularity, we don't agree that Rule 9(b)

15   applies to breach of fiduciary duty claims.  But even if it

16   does, I think we've stated the who, what, where and when

17   here.

18            THE COURT:  Was it a misrepresentation or failure

19   to make -- is it an omission?

20            MR. MINER:  It's really more of an omission.  You

21   can have breach of fiduciary duty without there being

22   misrepresentations or omissions.  That's just one type of

23   breach of fiduciary duty.

24            THE COURT:  He claims you've alleged

25   misrepresentations but didn't spell them out.

1          MR. MINER:  It's primarily -- it's a generic breach

2    of fiduciary duty.  And to the extent it relies on

3    misrepresentations or omissions, it's really the omission.

4    It's the omission to pass the information on to the parties

5    we allege it should have been passed on to.  It's not an

6    affirmative misrepresentation.  It's an omission with a duty

7    to speak.  And the who, what, where, and when on that are

8    certainly alleged.  We go into great detail on the Lawrence

9    Group's offer.  The date and time -- the content of it, the

10   date and timing of it, and the dates and timing of the

11   board's response.

12          On Count 5, the conversion claim, I think that's

13   pretty well flushed out in our briefs, and I'll rest on that.

14   But I do want to give --

15          THE COURT:  It doesn't really seem to fit is my

16   reaction to it.  I confess I haven't read every one of the

17   cases yet, but it just doesn't seem like anything has been

18   converted.

19          MR. MINER:  Ordinarily a conversion claim comes up

20   when someone has taken a chattel, your horse or something.

21   But there are Florida cases and Delaware class that we cite

22   in the brief that have recognized that you can have a

23   conversion of an intangible property interest as well or a

24   property right.

25          THE COURT:  But here they still have the shares,

1    don't they?  What did they get taken; the right to sell them

2    then --

3              MR. MINER:  Yes.

4              THE COURT:  -- for that price?

5              MR. MINER:  That's exactly right.  What they got

6    taken was their right to sell them to the Lawrence Group back

7    in '05 and '06.  That's a $293 per share intangible right

8    that was taken.

9              THE COURT:  What happens if tomorrow they could

10   sell them for 300?

11             MR. MINER:  Then that would be a damages issue

12   about whether they have any damages.  But I don't think it

13   affects whether they had a claim in the first place.

14             It would be no different than, you know, if someone

15   had a copyright that may have been of a certain value back in

16   '05 and '06 and somehow have that copyright converted or

17   taken from them and the copyright may have some different

18   value today.  Intangible property rights like that, interests

19   in a business, have been recognized by the Florida courts and

20   Delaware court that we cite as being the basis for a

21   conversion claim.

22             The last count addressed by Mr. Hinson was

23   Count 13, which is an ERISA count, and I would like to defer

24   to our co-counsel Mr. Squitieri who's prepared an argument on

25   that.

```
 1            MR. SQUITIERI:  Good afternoon, your Honor.  Lee

 2   Squitieri for the plaintiffs.  I'll address the 510 claim,

 3   and I'll be very brief.  It's actually a rather brief point

 4   in all parties' submissions.

 5            But today we heard counsel for the defendants

 6   indicate that they believe that as to the company the 510

 7   claim is well pleaded and should stand and it is only with

 8   respect to the two additional individual defendants who were

 9   named in Count 13 that they are seeking dismissal on the

10   grounds that as a matter of law no such claim can lie against

11   individuals because they are not the employer.  In so

12   arguing, counsel's main and only case was the Byrd case from

13   the Eleventh Circuit.

14            Well, your Honor, the first place to look on this

15   is the statute, and the statute has a statutory definition of

16   employer.  And the statutory definition of employer is, of

17   course, much boarder than just something that sounds like the

18   company for whom you work or that entity which pays your

19   salary.  In fact, the definition under Section 3, Subsection

20   (5) defines employer as, quote, any person acting directly as

21   an employer.  That would be US Sugar.  And that obviously is

22   a reason for the defendants' concession.  But it goes on to

23   address indirect instances.  And it reads, or indirectly in

24   the interest of an employer in relation to an employee

25   benefit plan, and includes a group or association of
```

 1    employers acting for an employer in such capacity.

 2            So we see that the definition addresses both direct

 3    and indirect employers and certainly goes beyond any sense

 4    that a 510 retaliation and interference with benefits claim

 5    is limited to only the employer.  It is, in fact, the

 6    statutory employer.

 7            The Byrd case is not to the contrary.  The Byrd

 8    case involved an employer, but it also involved an insurance

 9    company that somebody was trying to make an employer.  The

10    people didn't work at the insurance company.  And the

11    Eleventh Circuit did say only -- extends only to the

12    employer.  But they give no sense that they were trying to

13    reinterpret the statutory, rather broad statutory definition

14    of employer in ERISA, nor would it have been within their

15    power to do so.  And that's our argument, your Honor.  If you

16    have any questions, I'm happy to answer them.

17            THE COURT:  Do you have any case where liability

18    under that section is extended to an officer of a company?

19            MR. SQUITIERI:  Do I have any indication, your

20    Honor?

21            THE COURT:  No.  Any case.

22            MR. SQUITIERI:  Oh, any cases.

23            THE COURT:  The language you read me didn't sound

24    like it would apply to an officer or director, frankly.  You

25    said a group of associations or --

1          MR. SQUITIERI:  Well, that's one of the examples

2     that's used, your Honor.  But it does say "any person."  It

3     goes on to say directly or indirectly in the interest of an

4     employer.  And "person" of course is defined under the ERISA

5     statute.  You'll find it in our brief at Page 44.  But it's

6     29 USC Section 1002, Subsection (9), defining person as an

7     individual partnership, joint venture, corporation, mutual

8     company, joint stock, trust estate, association or employee.

9          So the statutory employer definition uses the word

10    "person."  The statutory definition of "person" includes

11    individuals and employees.

12         But, no, your Honor, I do not have a case directly

13    on point holding an officer or director liable on an

14    interference claim.

15         THE COURT:  Okay.  Thanks.

16         MR. MINER:  Your Honor, may I be heard briefly?

17         THE COURT:  It's getting late.  Why don't we hear

18    from Mr. Aragon.  He has been sitting patiently.

19         MR. ARAGON:  Rudy Aragon, your Honor, representing

20    Charles Stewart Mott Foundation.  Thank you very much.  May

21    it please the Court.

22         The Charles Stewart Mott Foundation is a Michigan

23    charity that is in Flint, Michigan.  It gives grants and does

24    charitable work throughout the entire world.  The only thing

25    in the complaint that's being alleged, as your Honor picked

1    up on, was that the Charles Stewart Mott Foundation owns

2    19 percent of the shares of US Sugar.  All it says in the

3    complaint is it owns a bunch of shares.  Nonetheless, the

4    foundation has been sued on three counts; two counts for

5    breach of fiduciary duty, that's Count 2 and 3, and Count 5

6    for conversion.

7              Now, all of these three state law claims have been

8    preempted by ERISA, and there's other reasons why these state

9    law claims fail to state a claim that have been made; those

10   arguments by Mr. Hinson and Mr. Coulson.  We adopt those

11   arguments.  But there are unique additional arguments as to

12   why the Mott Foundation ought to be dismissed from this case.

13   And I'm going to be very brief.

14             The law is clear that in order to have a fiduciary

15   duty to others with an interest in a company, a foundation

16   like the Mott Foundation or anybody else would have to have a

17   majority interest in the company or have control of the

18   business affairs of the company.  The complaint is clear.

19   The foundation only has 19 percent of the shares of the

20   company.  Not the majority.  There's been discussion about

21   the fact that there's some combination that's alleged in the

22   complaint.  You can do all the arithmetic you want.  You add

23   up everything according to the complaint and it's 47 percent.

24   It isn't 50 percent.

25             But even if you accept it, that it was more than

```
 1    50 percent, if you look at the Feldman case from the chancery

 2    court in Delaware, it's a 2007 case, you'll see that even

 3    where you've got as much as 60 percent, and I would say it's

 4    65 percent, in other words, all of the shares of the US Sugar

 5    except for those that are owend by the ESOP, if you combined

 6    all of those, the Feldman case basically says that you still

 7    don't pass the control test, the second thing you've got to

 8    have if you don't have a majority of the shares unless you

 9    have a voting agreement or you have a blood pact.  Well,

10    there's no voting agreement.  You can look crossways and any

11    way you want on those two shareholder agreements that the

12    Mott Foundation signed and that they've alleged in the

13    complaint and have been attached in a previous version of the

14    complaint.  They are not voting agreements.  They're

15    terminable at will, as Mr. Coulson indicated, with six

16    month's notice.  They don't include one of the groups, the

17    Mott White family, as part of its so-called control group.

18         THE COURT:  You know, I was going to ask him, but

19    why the fact that it's terminable at will, what difference

20    does that make when it hasn't been terminated?

21         MR. ARAGON:  Well, because it could be.  It's not a

22    the voting agreement and it's not a blood pact.  It's not

23    something where they all got together and said we're going to

24    vote to control the actions of this corporation.  That's what

25    the Feldman case is talking about.  There's no allegation of
```

1    that because that simply doesn't exist.  So there's no basis

2    for suing the foundation.  And they realize that.  When they

3    were presented with our motion to dismiss, they realized that

4    and they said the following in their papers, and I quote, the

5    Mott Foundation is the de facto majority and controlling

6    shareholder of US Sugar.  This is the basis of plaintiffs'

7    claims against the Mott Foundation in Count 2 and against

8    both the Mott Foundation and William S. White in Count 3, end

9    quote.

10         Now, where they came up with this de facto idea

11   bewilders me because there's no case law.  In fact, the case

12   law that's been cited on the subject of whether or not

13   something that Mr. White may have done in connection with his

14   work at US Sugar or on the board to be imputed to the

15   foundation is something that simply they haven't been able to

16   allege and simply hasn't happened because the case law is

17   clear that directors often and do and can wear many hats.

18   Many directors are on boards of directors that have

19   overlapping members of the board.  We've cited a number of

20   cases to that effect.  They have not rebutted them.  They

21   have even talked about those cases.

22         We have one case, the Stillwell case from the

23   Eastern District of Pennsylvania where a director of a

24   subsidiary took certain votes on a resolution at the board of

25   directors meeting of the subsidiary.  And the Court held that

```
 1   that does not bind the parent simply because he happens to be
 2   on the board of both companies.
 3          We also cite the Halmos case where there's a person
 4   who was a president of a foundation, and he took certain acts
 5   on his own behalf and on behalf of other distinct legal
 6   entities.  And the Court held just because he wears a board
 7   of directors hat as to those other distinct legal entities
 8   and he has a board of directors hat as to the foundation of
 9   which he was the president does not mean that those acts of
10   this particular person are imputed to that foundation anymore
11   than the acts that Mr. White allegedly took simply are
12   imputed to the foundation because he happens to wear two
13   hats.  And that's all that is in the complaint, and that's
14   all they allege.
15          Now, this imputation argument that I make applies
16   not just to the breach of fiduciary duty claim but also to
17   the conversion claim, because they don't say anything about
18   the foundation converting anything.  What they say is through
19   the acts of Bill White the foundation converted certain
20   interests in US Sugar.  That simply is not enough.
21          Your Honor, there were two initial complaints filed
22   by the Johnson plaintiffs.  We move to dismiss those two
23   complaints.  There were three other class actions, as you
24   know, that were filed thereafter.  Evidently, those
25   plaintiffs' lawyers in those three other class actions read
```

1   the complaint because if you look at their complaints, it

2   pretty much parallels, it parrots much of what's said in the

3   original Johnson complaint.  So they read the complaints.

4   They must have also read our motions to dismiss, because in

5   those class actions after the first two Johnson cases they

6   didn't sue the foundation.  They must have recognized that

7   there is no claim against the foundation.  Maybe Mr. Miner

8   prevailed upon them to include it, but the fact is there is

9   no claim against the foundation.

10          And we are hopeful that your Honor, like the

11  plaintiffs in the Textron (phonetic) and the other two cases,

12  will conclude that there's no independent claim against the

13  Charles Stewart Mott Foundation and that you will dismiss the

14  three counts, they're all state law claims, against the Mott

15  Foundation with prejudice.  Thank you, your Honor.

16          THE COURT:  All right.  Thank you.

17          Anything you want to add on the Mott Foundation?

18          MR. MINER:  I think you probably heard our response

19  on that, your Honor.

20          THE COURT:  Okay.  Well, I want to thank you all

21  for your excellent argument.  Also, I hope we didn't

22  inconvenience you with the change of location.  I know some

23  are from here, but others might have had to change plans

24  quickly.  We didn't find out until late Friday that the jury

25  wasn't going to come back.  There was at least the

1    possibility they weren't going to come back today.  So thank

2    you very much for rearranging your schedules and getting

3    here.

4           We will try to issue an order as quickly as we can.

5    And thank you for the arguments.

6        (Proceedings concluded at 4:53 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2        I, Karl Shires, Registered Professional Reporter, certify

3    that the foregoing is a correct transcript from the record of

4    proceedings in the above-entitled matter.

5        Dated this 26th day of March, 2009.

6

7    _____

        Karl Shires, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25